UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------
STANLEY FREDERIQUE, LUCKELSON
FREDERIQUE ELINE FREDERIQUE, PAUL
FREDERIQUE                                                    **Index No.: CV-11-1746 (SIL)**

       *Plaintiffs,*


   - against -


COUNTY OF NASSAU, POLICE OFFICER HECTOR
ROSARIO, and POLICE OFFICER JASON SCHOLL, in
their individual and official capacities,

       *Defendants.*
------------------------------------------------------------------------


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
***COUNTY OF NASSAU DEFENDANTS'* MOTION FOR SUMMARY JUDGMENT**



       LAW OFFICES OF FREDERICK K.
       BREWINGTON
  By: *Attorneys for the Plaintiffs*
       556 Peninsula Blvd.
       Hempstead, NY 11550
       (516) 489-6959 *phone*
       (516) 489-6958 *facsimile*



**Of Counsel: Frederick K. Brewington (FB5925)**

**TABLE OF CONTENTS**

Page

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

**TABLE OF CASES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

**PRELIMINARY STATEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF THE RELEVANT FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    **A.**    **Altercation Between Jasmin Johnson and Luckelson Frederique**
        ***(See Plaintiffs' 56.1 Count. Stmnt., Section A, ¶¶265-281)*** . . . . . . . . . . . . . . . . . . 2

    **B.**    **Nassau County Amt and Police Officers Arrived**
        ***(See Plaintiffs' 56.1 Count. Stmnt., Section B, ¶¶282-329)*** . . . . . . . . . . . . . . . . . . 3

    **C.**    **Defendants Did Not Attempt to Secure the Dog Before They**
        **Shot and Killed Same**
        ***(See Plaintiffs' 56.1 Count. Stmnt., Section K, ¶¶435-439)*** . . . . . . . . . . . . . . . . . . 8

    **D.**    **The Officers Made No Good Faith or Reasonable Attempt to**
        **Get Luckelson to Come out of the Home Before They Shot-up**
        **the Premises and Entered Same**
        ***(See Plaintiffs' 56.1 Count. Stmnt., Section L, ¶¶440-442)*** . . . . . . . . . . . . . . . . . . 9

    **E.**    **Stanley and Luckelson Are Placed under Arrest Falsely**
        **Charged with Various Crimes**  ***(See Plaintiffs' 56.1 Count. Stmnt.,***
        ***Section C, ¶¶330-368)*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        1.    Defendants Lacked Probable Cause To Charge Stanley
               Frederique With Menacing And Endangering The Welfare
               Of A Child: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        2.    Defendants Were Aware That They Lacked Probable
               Cause To Charge Luckelson Frederique With Menacing,
               Assault, And Resisting Arrest: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    **F.**    **The Charges Against Stanley and Luckelson Frederique Were**
        **Dismissed** *for Lack of Probable Cause (See Plaintiffs' 56.1 Count.*
        *Stmnt., Section D, ¶¶369-372)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

i

**G.** **Paul Frederique Signed Authorization to Search The House under Intimidation and Duress**
*(See Plaintiffs' 56.1 Count. Stmnt., Section F, ¶¶381-389)*. . . . . . . . . . . . . . . . 16

**H.** **Jasmin Johnson Recanted Her Statement(s)**
*(See Plaintiffs' 56.1 Count. Stmnt., Section G, ¶¶390-395)*. . . . . . . . . . . . . . . . 17

**ARGUMENTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**I.**
**ISSUES OF FACT EXIST AS TO PLAINTIFFS**
*STANLEY AND LUCKELSON FREDERIQUE'S*
**FALSE ARREST AND MALICIOUS PROSECUTION**
**CLAIMS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**A.** **With Respect To The False Arrest and Malicious Prosecution Of Plaintiff Stanley Frederique** *For The Charge Of Menacing***:**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**B.** **With Respect To The False Arrest and Malicious Prosecution Of Plaintiff Luckelson Frederique For Assault and/or Attempted Assault Against Officer Harracksighn and Resisting Arrest**. . . . . . . . . . . . . . . . . . . . . . . . . . 22

**C.** **Defendants' Police Officers _Collectively_ Initiated and Continued The False Arrests And Malicious Prosecutions Of Plaintiffs Stanley And Luckelson Frederique**. . . . . . . . . . . . . . . . . . . . . . . 23

**II.**
**DEFENDANT SCHOLL IS LIABLE FOR HIS FAILURE**
**TO ACT OR PREVENT THE WRONGFUL ACTIONS**
**TAKEN AGAINST PLAINTIFF LUCKELSON FREDERIQUE**. . . . . . . . . . . . . . . . . 25

**III**
**ISSUES OF FACT EXIST AS TO PLAINTIFFS' STANLEY AND**
**LUCKELSON FREDERIQUES' EXCESSIVE FORCE CLAIMS**. . . . . . . . . . . . . . . . . 28

**A.** **As For Stanley Frederique**
*(See* **Point V(B) below for further arguments/support)**. . . . . . . . . . . . . . . . . . 28

**B.** **As For Luckelson Frederique**
*(See* **Point V(B) below for further arguments/support)**. . . . . . . . . . . . . . . . . . 29

**IV.**
**PLAINTIFF CAN SUSTAIN A CAUSE OF ACTION FOR**
**DEFAMATION AGAINST THE COUNTY OF NASSAU**
**FOR THE FALSE STATEMENTS OF ITS OFFICERS**. . . . . . . . . . . . . . . . . . . . . . . . . . 30

**V.**
**DEFENDANTS ROSARIO AND SCHOLL ARE NOT**
**ENTITLED TO QUALIFIED IMMUNITY**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

     **A.**    **Defendant Rosario Is Not Entitled to Qualified**
            **Immunity For False Arrest Or Malicious Prosecution**
            **Against Plaintiff**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

     **B.**    **Defendants Rosario And Scholl Are Not Entitled**
            **to Qualified Immunity For Excessive Force**. . . . . . . . . . . . . . . . . . . . . . . . . 32

**VI**
**ISSUES OF FACT EXIST AS TO PLAINTIFFS'**
**MUNICIPAL LIABILITY CLAMS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

iii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**:

Amnesty America v. Town of West Hartford,
361 F.3d 113, 123 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 35

Anderson v. Branen, 17 F.3d 552, 557 (2d Cir.1994). . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 28, 32

Basset v. Ferrucci, 1996 U.S. Dist. LEXIS 8667, 13-15
(N. D.N.Y. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Boyd v. City of New York, 366 F.3d 72, 76 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . 19

Brawer v. Carter, 937 F.Supp. 1071, 1082 (S.D.N.Y.1996). . . . . . . . . . . . . . . . . . . . . . . . 32

Breitkopf v. Gentile, 41 F. Supp. 3d 220, 242-243
(E.D.N.Y. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Burdick v Verizon Communications,
305 AD2d 1030, 1031, 758 NYS2d 877 [2003]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Caidor v. M & T Bank, 2006 WL 839547 *8 (N.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . 19

 Callan v. State, 73 N.Y.2d 731, 535 N.Y.S.2d 590,(1988). . . . . . . . . . . . . . . . . . . . . . . . . 24

Carter v. Port Auth. of New York & New Jersey,
2004 WL 2978282, *8 (S.D.N.Y. Dec.20, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Castilla v. City of New York, 2012 WL 3871517 (S.D.N.Y. 2012) .. . . . . . . . . . . . . . . . . . . 35

 Celestin v. City of New York, 581 F. Supp. 2d 420, 429
(E.D.N.Y. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Connecticut ex rel. Blumenthal v. Crotty, 346 F.3d 84, 106
(2d Cir.  2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Cook v. Sheldon, 41 F.3d 73, 78-79 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Cowan v. Breen, 352 F.3d 756, 764-65 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Curanaj v. Cordone, 2012 U.S. Dist. LEXIS 135101, 29-30
(S.D.N.Y. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

Curry v. City of Syracuse, 316 F.3d 324, 335 (2d. Cir, 2003)............................ 18

D'Amico v Correctional Med. Care, Inc.,
120 A.D.3d 956, 962-963 (4th Dep't 2014). ........................................... 30

Davenport v. Cnty. of Suffolk, No. 2007 WL 608125, at *11
(E.D.N.Y. 2007)................................................................. 33

DeFilippo v. County of Nassau, 583 N.Y.S.2d 283, 284
(2d Dept.1992).................................................................. 23

Ellis v. La Vecchia, 567 F. Supp.2d 601, 607-608 (S.D.N.Y. 2008). ................. 20

Fulton v. Robinson, 289 F.3d 188, 197 (2d Cir. 2002) ............................... 19

Gagnon v. Ball, 696 F.2d 17, 21 (2d Cir. 1982) .................................... 27

Gashi v. County of Westchester,
2005 U.S. Dist. LEXIS 1215, 39-43 (S.D.N.Y. 2005). .............................. 34

Genia v. Parker, 2007 U.S. Dist. LEXIS 19700, 17 (E.D.N.Y. 2007). ................. 27

Geraci v Probst, 15 NY3d 336, 344-345 [2010]..................................... 31

Golden v. City of New York, 418 F.Supp.2d 226, 232 (E.D.N.Y.)..................... 18

Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865,
104 L.Ed.2d 443 (1989). ........................................................ 28

Green v. City of New York, 453 F.Supp.2d 690, 726
(S.D.N.Y. 2006)................................................................. 34

, Greenaway v. Cnty. of Nassau, 2015 U.S. Dist. LEXIS 43037,
29-30 (E.D.N.Y. 2015).......................................................... 35

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)................................... 31

Hayes v. N.Y.C. Police Dep't, 212 F. App'x 60, 62 (2d Cir. 2007) ................... 33

Hickey v. City of New York, 2004 WL 2724079, at *16
(S.D.N.Y. 2004)............................................................ 25, 27

Janetka v. Dabe, 892 F.2d 187, 190 (2d Cir. 1989). ............................. 19, 20

Jeffreys v. Rossi, 275 F.Supp.2d 463, 474 (S.D.N.Y.2003). ........................ 25

v

Lennon v. Miller, 66 F.3d 416, 421 (2d Cir.1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Llerando-Phipps v. City of New York, 390 F.Supp.2d 372,
383 (S.D.N.Y.2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . 19

Maxwell v. City of New York, 380 F.3d 106, 108 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . 33

McEvoy v. Spencer, 124 F.3d 92, 97 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Michael v. County of Nassau, 2010 WL 3237143, at *4 (EDNY 2010). . . . . . . . . . . . . . . . 35

Mitchell v. Victoria Home, 434 F. Supp. 2d 219, 227
(S.D.N.Y. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

Monell v. Department of Social Services,
436 U.S. 658,  690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611(1978) . . . . . . . . . . . . . . . . . . . . . . . . 34

Newton v. City of New York, 640 F.Supp. 2d 426, (S.D.N.Y. 2009). . . . . . . . . . . . . . . . . . . 19

Present v. Avon Prods., Inc., 687 N.Y.S.2d 330, 335
(1st Dept.1999).  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir.2001). . . . . . . . . . . . . . . . . . . . . . . 25

Rivera v. United States, 928 F.2d 592, 607 (2d Cir.1991). . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Robison v. Via, 821 F.2d 913, 924 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 33

Rodriguez v. New York City Police Dep't,
2011 U.S. Dist. LEXIS 122871, 13 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Salvatore v Kumar, 45 AD3d 560, 563, 845 NYS2d 384. . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Saucier v. Katz, 533 U.S. 194, 201 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Singer v. Fulton County Sherriff , 63 F.3d. 110, 117 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . 19

Terranova v. Torres, 603 F.Supp.2d 630, 631, 632 & n.3
(S.D.N.Y. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Universal Calvary Church v. City of New York,
2000 WL 1538019, at *9 (S.D.N.Y. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Weather v. City of Mount Vernon, 2011 WL 1046165, 11
 (SDNY. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

 Wong v. Yoo, 649 F. Supp. 2d 34, 61 (E.D.N.Y. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

### STATUTES:

42 USC § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## PRELIMINARY STATEMENT

Plaintiffs,  provide the following Memorandum of Law In Opposition To Nassau County Defendants' Motion For Summary Judgment. Specifically, Plaintiffs assert that summary judgment in this matter would be in error as there exist sufficient material issues of fact that, which would warrant that said issues to be decided by the trier of fact. Plaintiffs Eline and Paul Frederique were subjected to various violations under both State and Federal law.

Plaintiffs maintain that Defendants lacked probable cause to subject Plaintiffs Stanley and Luckelson Frederique to criminal process at all times relevant to the Complaint. Plaintiffs allege, _and can prove_, that Defendants attempted to secure Plaintiff's conviction merely because they sought to achieve a collateral objective, which was to shield themselves from liability after shooting their dog and shooting-up their home with **forty three (43)** bullets - not because Defendants believed (or had justifiable basis/evidence to conclude) that Plaintiffs Stanley and Luckelson Frederique were personally involved in any criminal wrongdoing.

## STATEMENT OF THE RELEVANT FACTS

**A detailed and recitation of the facts can be found in Plaintiffs' Local Rule 56.1 Counter Statement of Facts at paragraphs 265-442.**

    **A.**    **Altercation Between Jasmin Johnson and Luckelson Frederique**
                    *(See Plaintiffs' 56.1 Count. Stmnt., Section A, ¶¶265-281)*

Plaintiff Stanley Frederique **(hereinafter "Stanley")** had surgery on the morning of April 8, 2010  (*Id ¶265*). For most of the day, Stanley was in the hospital and was not home. Luckelson Frederique **(hereinafter "Luckelson")** stayed home and was present therein all day. (*Id ¶266*). He agreed to watch over his niece Zoe, while his brother McGregory Frederique **(hereinafter "McGregory")** and Jasmin Johnson **(hereinafter "Jasmin")** went out. Zoe is the child of Stanley's and Luckelson's brother McGregory Frederique and Jasmin Johnson.

Jasmin arrived back at the Frederique home with McGregory in the evening hours.(*Id ¶267*)

Jasmin came to the Frederique home and began arguing with Stanley and Luckelson Frederique (as well as Stanley Frederique's girlfriend - "Marleana") regarding Jasmin's child Zoe (*Id ¶268*). Specifically, Jasmin began "*blaming Luckelson Frederique for not watching the baby*" and for allowing Marlenea to watch the baby Zoe while Luckelson completed his school work. (*Id.*).

At that time, Luckelson and Stanley asked Jasmin to leave their home because Jasmin was being loud and disrespectful (*Id ¶270*). Jasmin began swinging at Luckelson Frederique (*Id ¶¶270 and 271*). Jasmin had Luckelson pinned up against a fence outside the home and began punching Luckelson in the chest area. (*Id ¶272*) Luckelson did not fight back with Jasmin (*Infra*). Stanley tried to separate Jasmin from Luckelson. (*Id ¶273*). However, Jasmin also hit Stanley while he was attempting to separate Jasmin from Luckelson (*Id*).

After Stanley got Jasmin to release Luckelson, Luckelson went into the home, placed water in a ceramic jar, brought it outside, and threw the water of Jasmin. He <u>*did not*</u> hit Jasmin with the jar (*Id ¶274*). Jasmin attacked Luckelson again, grabbed him, and then they both fell to the ground. Jasmin (who was significantly heavier than Luckelson) fell on top of Luckelson.(*Id ¶275*). The ceramic jar fell to the ground and broke into pieces. The shattered jar caused cuts and injuries to both Jasmin and Luckelson. (*Id ¶276*).

Luckelson dislocated his right shoulder when Jasmin attacked him and fell with him to the ground. (*Id ¶277*) After Jasmine injured Luckelson's shoulder, Luckelson was then escorted to the basement of the home by Stanley and Marleana, where he remained thereafter (*Id ¶278*) Luckelson Frederique's shoulder was dislocated at that time and he was sitting in the basement in extreme pain (*Id ¶279*) Stanley then called the police (911) because Luckelson needed immediate medical assistance for his dislocated shoulder. (*Id ¶282*). Some time after, Jasmin also called the police (<u>*Id.*</u>).

Before the police arrived, Stanley secured their dog Angel in the basement where Luckelson was at the time (*Id ¶280*).Stanley Frederique placed Angel inside "his bedroom," which was located in the basement of the home, and then he closed the door (*Id ¶281*).

**B.    Nassau County Amt and Police Officers Arrived**
**(See Plaintiffs' 56.1 Count. Stmnt., Section B, ¶¶282-329)**

Nassau County AMT and Police officers arrived at the scene approximately 20 - 30 minutes after Stanley placed his first call to 911. Initially, only two or three police cars showed up - officers Carbone and Cetto. Defendant Officer Scholl arrived shortly after and Carbone handed Stanley off to Scholl for transport. (Def's 56.1 ¶¶65and 66).

When the police first arrived, they immediately began asking about "guns and drugs."  (*Id ¶284*). Stanley began "trying to explain to them that [he] initially called them because [he] wanted to get [Jasmin] off of their property." **(*Id ¶285-286*)**. The Police (Carbone, Cetto and Scholl) ignored Stanley and instead told him to get up against the wall. (*Id.*) Stanley explained that he just had surgery and that he was not involved in the altercation between Jasmin and Luckelson. Nevertheless, the police "*took [him] and threw [him] up against the gate*," which caused his face to hit the gate. Stanley was also "*punched in his back when [he] just had surgery*." Then the police began searching Stanley and placed him in handcuffs. (*Id.*).

Stanley did not resist officer Carbone in anyway  (*Id ¶288; see also Def's 56.1 ¶65*). Stanley was in pain due to the officers manhandling him after he just had his surgery. (*Id ¶289*). While he was with Defendant Officer Scholl, Stanley Frederique was crying in pain and asking for his medication at the time (*Id.*). He was ignored.

Stanley then told Carbone, Cetto, and/or Scholl that his brother Luckelson was "*downstairs and needed medical attention*."  (*Id ¶290*). Stanley Frederique continued to tell the police (including Defendant Scholl) that Luckelson was in the basement and that he "*needed help*." (*Id.*). At first,

3

Stanley believed that the police were "*going to give Luckelson aid*." (*Id*.). Defendant Scholl admits that Stanley told him the above and that Luckelson could not come out because he was in the basement injured (*See Exhibit T*, Scholl statement). Defendant Scholl ignored this information.

During this time, Marleana also continually told the police officers that Luckelson was injured downstairs. (*Id ¶292*) She asked one of the officers if the officers could go down and attend to Luckelson due to his injuries. One officer replied "*I don't give a fuck about his arm*." (*Id ¶292*)

The Police asked Paul Frederique **(hereinafter "Paul")**, who came outside during the disturbance, to get Luckelson to come outside. (*Id ¶293*). Paul called Luckelson on his cell phone and told him to come out. Paul wanted to "*go downstairs and chain the dog up but the officers were telling him no."* (*Id*) Luckelson told his father Paul that he could not go upstairs because he was in extreme pain due to his arm injury. (*Id ¶294*). Defendant Scholl confirms that he**"asked Stanley Frederique why his brother Luckelson would not come out of the basement and he stated that the [Jasmin] broke his brother's arm and <u>his brother was unable to come to the door</u>."** (*Id ¶294*)

While Luckelson was in the basement, Stanley and Paul Frederique *"plead with [the police] and begged them to tie up the dog*." (*Id ¶299*-301). Paul asked the police on several occasions if he could "*go tie up the dog*." The police refused their request(s). (*Id*.) The police threatened to arrest Paul if he attempted to enter the home to secure the dog (*Id*) The police then took Paul to the other side of the street - opposite to the house (*Id*.). Stanley's then girlfriend Marleana was present outside the home when the police arrived. She also tried, and or attempted to enter the house to tie the dog up and was told by the police that she would get arrested if proceeded (*Id ¶302*).

Stanley Frederique never said "*move away before he let the dog go."* (*Id ¶303-305*). According to Stanley, "*nobody ever said that to the police*" at anytime (*Id*.). The police falsely accused Stanley of

4

releasing the dog on the police, which was false and impossible because Stanley was in custody of the police while the dog was still inside the home. (*Id.*)

**Luckelson Frederique never barricaded himself in the home or refused to come out.** In fact, Luckelson believed that the police were present to help him due to his dislocated shoulder. He was unaware that the police wanted to arrest him. (*Id* ¶*306*). While downstairs, Luckelson did not hear an officers tell him to come out of the house and he was unaware that officers wanted him to exit the home *to arrest him*. (*Id* ¶*295*) Luckelson thought that the police were there to give him medical assistance for his shoulder injury. (*Id*) Luckelson was advised by Paul to come upstairs. So, while in extreme pain, Luckelson "*repositioned his arm and slowly made his way up the stairs.*" (*Id* ¶*296*) Luckelson began to go upstairs because he "*wanted medical attention and it seemed like the officers were not willing to go downstairs.*" (*Id* ¶*297*) Luckelson got to the top of the stairs, went to the entrance, and slowly opened the door.(*Id* ¶*298*) While walking up the stairs, Luckelson did not hear anything that was happening outside the home with the police. (*Id.*)

When Luckelson Frederique walked up the stairs to exit the home, the dog Angel followed him up. Luckelson then opened the door and the dog Angel "*calmly*" walked out of the door. (*Id* ¶*307- 308*). Angel did not run out or run after the officers (*Id.*) As Luckelson opened the door, the family's dog Angel "*walked out.*" (*Id.*) Within a few seconds after Angel walked out, Luckelson heard a storm of gun shots erupt outside (*Id*). Luckelson stood in shock as he witnessed officers "*running passed his door shooting toward the dog.*" (*Id* ¶*309-310*) In shock and fear, Luckelson automatically closed the door when he heard the gunshots. (*Id.*) Luckelson retreated to the stairway leading toward the basement. (*Id.*) To Luckelson, "*it sounded like a war*" and bullets were flying everywhere (*Id* ¶*311*). Indeed, A bullet almost struck Luckelson because bullets were piercing the walls and windows as they  were entering the house where Luckelson stood (*See Exhibit S*, bullet hole photos).

5

It was later revealed that the Police officers recklessly fired a total of **forty three (43) rounds** at the dog Angel, as she ran through the yard in fear - trying to escape the noise and bullets. (*Id* ¶*312*). Officers Siar, Carbone, Pizzimenti and McNeil fired bullets wildly at the dog Angel, which pierced Plaintiffs' house and neighboring yards as well as Angel. (*See also*, *Exhibit S*, bullet damage photos). Angel was killed in cold blood. And Plaintiff's home looked like Swiss cheese. (*Id.*)

At that time, the police had already placed Stanley Frederique in police car where they continued to question him about "*guns and drugs*." (*Id* ¶*313*) While Stanley sat in the car, he heard gun shots and saw flashing lights from the 43 rounds as they were being shot by the police into his yard. (*Id* ¶*314*). To his horror, Stanley thought that the police officers shot Luckelson. This horror was manifested for Luckelson as bullets entered the walls and windows of his home all around him!

After the rain of gunshots, the police entered the Frederique home and saw a *frightened* Luckelson on the stairway - shaken. Officers Pizzamenti, Harracksingh, Barricelle, Carbone, and Rosario were among the officers went downstairs. (*Id* ¶*315*) The Officers  told him to put his hands up but he could not because one arm was dislocated. Luckelson pointed to his arm. Luckelson told the officers that his arm was dislocated and the officers *"roughly took his dislocated arm behind his back and brought him down"* to the ground (*Id.*)

Despite what the County Defendant now says to the Court in their motion, Luckelson attempted to comply with the officers' commands and he went down to the ground and was handcuffed. (*Id* ¶*316*). According to Officer Harracksingh, Luckelson was "***obeying Sgt Pizzamenti's commands***" - - "*show me your hands, get on the ground*." "He was beginning to get on the ground." (*Id* ¶*316*). According to Defendant Officer Rosario, when the Officers yelled "*stop running*," Luckelson complied with their order and stopped. (*Id* ¶*316*). Then they yelled "*let me see your hands*" and Luckelson complied and showed his hands. (*Id*). Luckelson held his hands out in front of him. (*Id*).

Then, other officers came downstairs and started beating Luckelson. According to Luckelson, the officers were "*literally beating the soul out of his body*." (*Id* ¶*317*). Luckelson recalls asking an African American officer why they were hitting on him. In response, the officer replied "*shut up nigger*" and punched Luckelson in the face. Officer Rosario then kicked Luckelson in the face. (*Id*) According to Luckelson, he laid there while the officer beat him up and was "*begging for his life . . . begging them not to kill him . . . and asking them why they were beating him up.*" (*Id* ¶*336*).

Defendant Rosario was "*pounding Luckelson's face with his feet.*" Luckelson was also kicked in the ear and felt punches to his face and neck area while he laid on the ground. (*Id* ¶*318*-319). Officer Rosario kicked Luckelson in his head/face area twice. (*Id*) One officer put his foot on top of Luckelson's head and stood on Luckelson's head for several seconds. (*Id* ¶*320*). The entire time, Luckelson was screaming "*Help. Please.*" (*Id*.) The officers were kicking and punching Luckelson while he laid on the ground.(*Id* ¶*321*-325). The officers kicked Luckelson in his "*legs, arms and back.*" **They were also kicking Luckelson in his dislocated shoulder.** (*Id*.) Luckelson sustained an injury "laceration" to his ear. (*Id* ¶*324*). Luckelson had blood on his ear and face. (*Id*.)

While Luckelson laid on the floor, he heard the police yell *"search the house for drugs*." (*Id* ¶*322*). Luckelson then saw the same officers "*open drawers, lift the bed, and puncture a hole in the ceiling*." (*Id*) Luckelson was then taken outside in handcuffs where he saw his dog Angel laying on the ground "*riddled with bullets*." (*Id* ¶*323*).

Luckelson was taken to a police car where he repeatedly asked for an ambulance and his request were ignored. Instead, the police took him to a police car. (*Id* ¶*326*). Luckelson continued to beg the officer for "*20 - 30 minutes*" to take him to an ambulance. After about 30 minutes, he was placed in an ambulance (*Id*.).

7

As per Paul Frederique, the police *"shot the dog, went into the basement, and then beat Luckelson."* (*Id* ¶328). The police brought Luckelson out of the home and he was "bleeding from his ear and nose," the side of his face was swollen and he was wearing no shoes on his feet (*Id.*) Luckelson sustained an injury "laceration" to his ear. (*Id.*) Luckelson had dried blood on his ear and face. (*Id.*)

### C.   Defendants Did Not Attempt to Secure the Dog Before They Shot and Killed Same (*See Plaintiffs' 56.1 Count. Stmnt., Section K, ¶¶435-439*)

Despite opportunities to do so, Officer Carbone and the other officers took no action to ensure that the dog was secured (*Id* ¶435). The officers took no steps to try to secure the dog before the dog came out of the home. (*Id.*). Carbone testified that during arrests where there is a dog present at the scene, "***usually, we ask them to place [the dog] in a room prior to us entering***." (*Id* ¶436). Carbone did not give this instruction to the Frederiques and is not aware if any other officers gave this instruction to secure the dog. (*Id.*). Officer Carbone does not recall ever being trained with regard to the handling of animals (*Id* ¶438)

Carbone was never trained with regard to non lethal force against animals. Carbone does not know if pepper spray would have any effect on a dog. (*Id* ¶437-438). Carbone was never trained with regard to subduing animals or using less lethal means against animals in situations such as this - at all(*Id.*).

If there is a dangerous dog on the scene, ESU is usually called - "they have tranquilizer guns."(*Id* ¶436). ESU has the proper training to deal with dogs. (*Id.*) ESU was not on the scene when the dog was shot. (*Id.*)

### D.   The Officers Made No Good Faith or Reasonable Attempt to Get Luckelson to Come out of the Home Before They Shot-up the Premises and Entered Same (*See Plaintiffs' 56.1 Count. Stmnt., Section L, ¶¶440-442*)

8

According to Detective Rogan, Hostage negotiation teams are usually called to the scene for barricade situations. (*Id* ¶*440-441*)But, a hostage negotiation team was not called to this scene though the police waited outside for hours before they entered (*Id*). Before officers entered the home, no one made any announcements over a loud speaker or megaphone to Luckelson Frederique, who was inside the home. (*Id* ¶*441*) Carbone does not recall anyone making any announcements for Luckelson to come out of the house (*Id.*. Carbone did not hear any of the other officers say anything before they entered the Frederique home. (*Id.*). AMT Ferrucci did not hear any officers or members of any specialty units tell anyone to come out of the house before the shooting began (*Id* ¶*442*)

**E.      Stanley and Luckelson Are Placed under Arrest Falsely Charged with Various Crimes** *(See Plaintiffs' 56.1 Count. Stmnt., Section C, ¶¶330-368)*

Stanley was taken to the precinct. He did not know why he was being arrested and continued to ask the police for an explanation. He was not told why he was arrested (*Id* ¶*330*) Stanley was then processed and placed in a jail cell in the precinct, where he remained for at least four to six hours. (*Id* ¶*331*) While being arraigned, following his arrest, for the first time, Stanley Frederique learned that he was being charged with "*endangerment of a child*" and "*resisting arrest.*" Stanley also learned that he was being falsely charged for "*releasing the dog on the officers.*" (*Id* ¶*332-333*) Bail was set at $10,000.00 for Stanley. (*Id*) Stanley spent two days in jail while his family was trying to find the resources to bail him out. (*Id.*)

Luckelson was falsely charged with Assault in the Second Degree because the police falsely asserted that he "*barricaded himself in the basement of his home and purposefully let his dog, a pit bull, out into the rear yard where the officers had a perimeter set up and did place the officers in fear of their safety and/or hurt the officers.*" (*Id* ¶*334-337*) The police knew that Luckelson never barricaded himself in the home, nor did he let his dog loose on the police. (*Id*) Luckelson was falsely

9

charged with resisting arrest. Luckelson was taken to court to be arraigned without any shoes and/or was barefoot (*Id*).

1.      **Defendants Lacked Probable Cause To Charge Stanley Frederique With Menacing And Endangering The Welfare Of A Child:**

Stanley Frederique was (falsely) charged with Menacing in the Second Degree (Penal Law § 120.14[1])  (*Id ¶338*). The Information charging Stanley with this crime states that Stanley: "*did threaten to let loose his pit bull on anyone that entered the yard . . . stating 'move away from the fucking door before I let the dog go."* (*Id*.) According to the Information, the allegations were based upon AMT Ferrucci's observations (*Id*.) The information was untrue as set-out below. (*Id ¶304*)

However, AMT Ferrucci admits that he does not know who threatened to release the dog.  (*Id ¶339*) But, Stanley was (falsely) charged with this crime anyway. AMT Ferrucci heard a "muffled voice" say "get away from the gate or I'll let the dog out." (*Id*). AMT Ferrucci "assumed" that the comment was made to him, but was not sure. (*Id*.). AMT Ferrucci had no idea what the person who made the comment/threat looked like (*Id*.). When asked if he could identify the person that made the alleged threat, AMT Ferrucci responded *"I wouldn't have that information. I don't know*." (*Id ¶339*) When asked "*So, you're unable to identify whether it was Stanley Frederique or Luckelson Frederique that allegedly threatened you that night?*," AMT Ferrucci responded "**yes.**" (*Id*.). According to Ferrucci' own testimony, Ferrucci had no reason to believe that they were going to let the dog out of the gate. (*Id ¶339*).

Further, Officer Cetto claims that a threat was made directly to him, Officer Carbone, and Sgt. Pizzimenti - "*Don't come any closer. I'm going to let the dog out*." (*Id ¶340-342*). However, it is clear that from the moment that Officer Cetto allegedly arrived at the scene, Stanley was immediately placed in custody, in a police car, and could not have made the statement. (*Id¶304*).According to Police Officer Carbone, Stanley Frederique "*didn't have the opportunity to release the pit bull*

10

*because*" he was handcuffed and in police custody at the time of the alleged statement/threat (*Id* ¶*341*). At all times, Defendants knew that they lacked probable cause to arrest, charge, or prosecute Stanley Frederique for Menacing - but charged him anyway. (*Id*.)

Stanley was also falsely charged with Endangering the Welfare of a child for, allegedly, having "*a physical confrontation with the victim Jasmine Johnson in front of the victim's one year old daughter. The child was in a stroller with no shoes, socks or coat. The assault of the victim carried into the street leaving the child unattended where Defendant Stanley Frederique had left her*."(*Id* ¶*343-344*) At all times, the police were aware that the child always remained in the presence of Stanley and Luckelson Frederique, and/or Jasmin Johnson. (*Id*.) Even when the *alleged* fight took place, the child was never left unattended. Further, Jasmin Johnson NEVER accused Stanley or Luckelson of leaving the child unattended. (*Id.*). Further, once the alleged victim Jasmin Johnson was able to review the initial statement written for her by the police, she immediately noticed that the statement contained falsities and attempted to recant the police's false statement. (*Exhibit L*).

Jasmin Johnson actually reviewed the statement that was written for her by the police and learned that "*the statements were false*" and that "*her words were changed and flipped around and tampered with to better justify the police and their wrongdoing*."(*Id* ¶*346*). Jasmin also stated that she was "*insulted*" and being used as "*bait*" because the "*police needed to cover up their dirty tracks*." (*Id*.) Ms. Johnson refused to participate in the prosecution knowing that the Defendants were (maliciously) using her to wrongfully charge Plaintiffs. (*Id*.) According to Jasmin, the police made up their allegations and used her to pursue same.

**2.    Defendants Were All Aware That They Lacked Probable Cause To Charge Luckelson Frederique With Menacing, Assault, And Resisting Arrest:**

First, although Luckelson Frederique was alleged to have been involved in the same, and/or more serious alleged criminal acts against Jasmin Johnson, **Defendants never charged Luckelson Frederique with Endangering the Welfare Of A Child, as they charged Stanley Frederique.** Luckelson Frederique was charged with Assault In the Second Degree - a D Felony. (*Id* ¶*348*). The Felony Complaint alleged that "*Defendant did, during an argument with the victim, take a small vase and strike the victim in the head causing a laceration to the head and behind the left ear. These injuries required immediate medical attention and several stitches to close the wound.*" (*Id*). However, once the alleged victim Jasmin Johnson was able to review the initial statement written for her by the police, she immediately noticed that the statement contained falsities and attempted to recant the police's false statement. (*Id* ¶*346, 349*).

Luckelson Frederique was also charged with Assault In the Second Degree, Subdivision 3, a D Felony - which deals with assaults against police officers. (*Exhibit P.* Felony Complaints, Re: Luckelson Frederique - Assault 2nd, Subd. [3]). This charged alleged that "*while Defendant was being placed under arrest . . . did resist your deponent's attempts to handcuff him. During the struggle with the defendant, your deponent in full uniform with shield displayed and county patches suffered a sever knee sprain requiring immediate medial assistance.*" (*Id* ¶*351-353*) The complainant to the above charge was Officer Harracksingh (*Id.*) Harracksingh signed the district court info charging Luckelson with resisting. (*Id*).

However, as per the testimony of P.O. Harracksingh, Harracksingh sustained an injury to his knee **but does not know how the injury was sustained**. (*Exhibit J*, Harracksingh Dep. 83). **Harracksingh had no reason to believe that Luckelson assaulted him or caused the injury to his knee** (*Id* ¶*353*). [*emphasis ours*]

Luckelson Frederique was also charged with Attempted Assault In The second Degree, Sudivision 3 - an E Felony. (*Exhibit P.* Felony Complaints, Re: Luckelson Frederique - Att Assault

2nd, Subd. [3]). In this regard, the Felony Complaint alleges that "*the defendant barricaded himself in the basement of his home and purposefully let his dog, a pit bull, out into the rear yard where the officers had a perimeter set up and did place the officers in fear of their safety and or hurt the officers*." (*Id ¶354-355*) Luckelson was shocked when the police began firing at his dog Angel and was unaware what was happening outside. (*See Id*. ¶¶294-298 and 306-312). However, Luckelson Frederique never barricaded himself in the home or refused to come out. In fact, Luckelson believed that the police were present to help him due to his dislocated shoulder. He was unaware that the police wanted to arrest him. (*Id*).

Further, according the Sgt. Pizzamenti - the supervising officer at the scene, who was closest to Luckelson when the shooting incident occurred, Pizzimenti never heard anyone "command" the dog to attack any officers. (*Id ¶356*) In fact, according to Sgt. Pizzamenti, Pizzimenti does not know how the door came open or how the dog was let out of the door. (*Id ¶356*).No one yelled anything out of the doorway before the dog came out. (*Id*.) **Pizzimenti does not even know if the dog was actually "let out" of the house by Luckelson** (*Id*). Pizzimenti did not see Luckelson take any specific action to let the dog out. (*Id*.) According to Pizzimenti, the criminal charges were dropped because they couldn't prove intent - by Luckelson - to let the dog out intentionally (*Id*).

Officer Carbone made the decision to charge Luckelson with Assault in the second degree for letting the dog loose on officers (*Id ¶357*). While Carbone "agreed with" this charge (*Id*.). But, he did not hear anyone (including Luckelson) yell or say anything when the dog was let out of the door. (*Id ¶358*) No one yelled "sic' em" or get em" or ordered the dog to attack. (*Id*.)  Carbone "*did not hear anything come out of anyone's mouth*" regarding letting the pit bull loose on officers (*Id ¶359*).

As for the alleged barricade, before officers entered the home, no one made any announcements over a loud speaker or megaphone to Luckelson, at the time that he was inside the home. (*Id ¶360*).

13

Carbone does not recall anyone making any announcements for Luckelson to come out of the house (*Id*.). Despite what Defendants say now in their motion, Carbone testified that he did not hear any of the other officers say anything before they entered the Frederique home. (*Id*.).

Again, as per the testimony of AMT Ferrucci, AMT Ferrucci admits that he does not know who threatened to release the dog. (*Id ¶361*) AMT Ferrucci had no idea what the person who made the comment/threat looked like (*Id ¶361*). When asked if he could identify the person that made the alleged threat, AMT Ferrucci responded ***"I wouldn't have that information. I don't know*.**" (*Id*.). When asked "So, you're unable to identify whether it was Stanley Frederique or Luckelson Frederique that allegedly threatened you that night?," AMT Ferrucci responded "**yes.**" (*Id*. 191:7 - 192:18). Ferrucci had no reason to believe that they were going to let the dog out of the gate. (*Id*.).

Luckelson Frederique was also charged with Resisting Arrest. (*Exhibit P*. District Court Information, Re: Resisting Arrest - Luckelson Frederique). The Information stated, in pertinent part: "*the defendant did flail his arms and refused to be handcuffed causing several officers to restrain the defendant. During the struggle the defendant caused your deponent to suffer a severe knee sprain requiring immediate medical attention*." (*Id ¶362*)

But, this claim is disputed as **Luckelson could not have held his arms and hands underneath his body, or "flail", *because his shoulder was dislocated* and in extreme pain at all times during the incident.** (*Id ¶363*) The police told Luckelson to put his hands up, but he could not because one arm was dislocated. Luckelson pointed to his arm. Luckelson told the officer that his arm was dislocated and the officer "*roughly took his dislocated arm behind his back and brought him down*." (*Id ¶363-364*).Also, by all accounts of the police officers, Luckelson was seen standing at the bottom of the staircase. (*Id ¶364-365*) Luckelson was "***obeying Sgt Pizzamenti's commands***" - - "show me your hands, get on the ground." He was beginning to get on the ground." (*Id*.). When they yelled

14

"stop running," Luckelson complied with their order and stopped. (*Id*) Then the police yelled "*let me see your hands*" and Luckelson complied and showed his hands. (*Id.*). Luckelson attempted to comply with the officers' commands and he went down to the ground and was handcuffed. (*Id ¶365*) Then, other officers came downstairs and started beating Luckelson after he complied and dropped to the ground (*Id.*). Luckelson attempted to comply with the officers' commands and he went down to the ground and was handcuffed. (*Id ¶366*) Then, other officers came downstairs and started "*literally beating the soul out of his body.*" (*Id ¶366-368*).At all times, the officers were aware that Luckelson did not resist arrest (*Id.*).

**F.    The Charges Against Stanley and Luckleson Frederique Were Dismissed** *for Lack of Probable Cause (See Plaintiffs' 56.1 Count. Stmnt., Section D, ¶¶369-372)*

The criminal charges against Luckelson and Stanley Frederique were dismissed after over a year of court appearances (*Id ¶369*-370) Plaintiff Luckelson and Stanley Frederique went to court over 20 times before the charges were dismissed. (*Id*)

Defendants claim that the prosecution was terminated because Jasmin Johnson refused to cooperate. However, the District Attorney's office **did not need Jasmin Johnson to prosecute Plaintiffs for Menacing the Police Officers, Resisting Arrest, or Assault in the Second Degree against Police Officers**. (*Id ¶371*-372). All of the aforementioned charges did not involve Jasmin Johnson, nor did they require her testimony. (*Id.*) As the Police Officers herein were the complainants, the People could have proceeded with the prosecution without Jasmin Johnson. (*Id.*) But, they did not because - like Sgt. Pizzamenti admitted - **The criminal charges were dropped because they couldn't prove intent** (*Id*).

**G.    Paul Frederique Signed Authorization to Search The House under Intimidation and Duress** *(See Plaintiffs' 56.1 Count. Stmnt., Section F, ¶¶381-389)*

After Luckelson Frederique was brutalized and arrested, while Luckelson laid on the floor in handcuffs, he heard the police yell "*search the house for drugs*." Luckelson then saw the officers "*open drawers, lift the bed, and puncture a hole in the ceiling*." (*Id* ¶*381*-382) Police Officer Cetto admits that the officers were "*searching other rooms*" after Luckelson was arrested  (*Id*). This was before any consent to search was given - or actually forcefully taken - by the police. (*Id.*).

There was no warrant executed for this property (*Exhibit I*, Rogan Depo. 34:2-4). According to Officer Cetto, the police **did not need a warrant because they** *"were inside already*." (*Id 383*) Among other areas in the home, the officers (including Cetto) went into Eline Frederique's sacred "*prayer room*" where she kept her statues of various saints. (*Id* ¶*384*). The police ransacked the prayer room, desecrated same, broke several statues, ripped pictures off the walls, and destroyed flowers therein. (*Id* ¶*383-384*)

The police did not ask Paul Frederique for permission to go upstairs in the home. The police began violently kicking at the door to force their way into the upper part of the house. (*Id* ¶*385*) The police intimidated Paul Frederique into giving them the key to the upper portion of the home. (*Id.*) They then went upstairs and searched the home without consent.  (*Id* ¶*385*) Paul Frederique gave the police the key to the door *"after they completely almost broke down the door*." (*Infra*) Paul gave the police the key in order to "*prevent them from breaking down the door,*" which they were trying to force their way into at the time - as Paul watched. (*Id* ¶*386*) Only after the police ransacked the Frederique home, did the police present Paul Frederique with a consent to search form to sign (*Id* ¶*387*). Paul signed the form under fear and duress (*Id.*)

Later, Detective Rogan presented Paul Frederique with a consent to search premises form and told him to sign it. (*Id* ¶*388*). At the time, Plaintiff Paul Frederique was "*scared*" and did not

"*understand what was going on*" when he signed the authorization for the police to search his home.(*Id*.) According to Detective Rogan, who was the lead detective in this matter, the Nassau County Police Department has no written policy regarding searches of the home (*Id*).

### H.    Jasmin Johnson Recanted Her Statement(s)
### *(See Plaintiffs' 56.1 Count. Stmnt., Section G, ¶¶390-395)*

After the incident The Frederique family stopped communicating with Jasmin Johnson and had no further contact with Jasmin. Also, Jasmin was not communicating with the District Attorneys or the police regarding this matter after the day of the incident. (*See Exhibit V*, "dismissal memo" from ADA Finley to ADA Meg Reiss, dated 11/3/10). But, Jasmin recanted her criminal complaint against Stanley and Luckelson Frederique. (*Id* ¶390).

Once Jasmin Johnson actually reviewed the statement that was written for her by the police and learned that "*the statements were false*" and that "*her words were changed and flipped around and tampered with to better justify the police and their wrongdoing*." (*Id* ¶391). Jasmin also stated that she was "*insulted*" and being used as "*bait*" because the "*police needed to cover up their dirty tracks*." (*Id*.) Ms. Johnson refused to participate in the prosecution knowing that the Defendants were (maliciously) using her to wrongfully charge Plaintiffs. (*Id*.)

Stanley was unaware the Jasmin recanted her statement against him. (*Id* ¶392-393). Neither Stanley or Luckelson asked Jasmin to recant her statement (*Id*.) Luckelson Frederique did not speak to Jasmin after the date of the incident either. He never asked her to recant her statement against him (*Id*). Luckelson was not even aware that Jasmin recanted her statement at the time (*Id*.)   No one in the Frederique family asked Jasmin to drop the criminal charges (*Id* ¶395) She did so on her own. According to Luckelson, Jasmin "*felt guilty for lying [to the police in her statement] and basically wanted to drop the charges*." (*Id* ¶394).

17

**ARGUMENTS**
**I.**
**ISSUES OF FACT EXIST AS TO PLAINTIFFS *STANLEY AND LUCKELSON FREDERIQUE'S* FALSE ARREST AND MALICIOUS PROSECUTION CLAIMS**

As an initial matter, Plaintiffs' causes of action for false arrest were intended to apply to Plaintiffs Stanley Frederique and Luckelson Frederique only. Insofar as the Complaint can be construed to assert claims for false arrest on behalf of Eline Frederique and Paul Frederique, Plaintiffs respectfully withdraw any such claims <u>as to them only</u>.

**False Arrest:**

To establish a constitutional claim for false arrest under the Fourth Amendment Plaintiffs' "must demonstrate (1) that defendant intended to confine him, (2) that he was conscious of the confinement, (3) that he did not consent to the confinement, (4) that confinement was not 'otherwise privileged.'" <u>Yang Feng Zhao</u>, 656 F.Supp.2d at 386 (*citations omitted*).

"In the case of a warrantless arrest, the seizure is presumptively unlawful, and the defendant bears the burden of demonstrating that he had probable cause to make the arrest." *Id.* (*See* <u>Curry v. City of Syracuse</u>, 316 F.3d 324, 335 (2d. Cir, 2003); <u>Golden v. City of New York</u>, 418 F.Supp.2d 226, 232 (E.D.N.Y.). "**A police officer may not close his eyes to facts that would help clarify the circumstance of an arrest**. Reasonable avenues of investigation must be pursued." <u>Yang Feng Zhao</u>, 656 F.Supp.2d at 386.

**Malicious Prosecution:**

"To state a claim for malicious prosecution under New York law, plaintiff must allege that: '(1) [defendants] initiated a prosecution against plaintiff, (2) without probable cause to believe the proceedings can succeed, (3) the proceeding was begun with malice, and (4) the matter terminated in the plaintiff's favor.'" *Id..* Furthermore, plaintiff "must show some post-arraignment deprivation of liberty that rises to the level of a constitutional violation." <u>Singer v. Fulton County Sherriff</u> , 63

18

F.3d. 110, 117 (2d Cir. 1995). Such a showing implicates a violation of plaintiff's Fourth Amendment rights.  Newton v. City of New York, 640 F.Supp. 2d 426, (S.D.N.Y. 2009).

"The relevant probable cause determination is whether there was probable cause to believe the criminal proceeding could succeed, and hence, should be commenced ... (*internal citations omitted*) as of the time the criminal proceeding commences (e.g., the time of arraignment) ... and is defined as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." Caidor v. M & T Bank, 2006 WL 839547 *8 (N.D.N.Y.) *citing* Boyd v. City of New York, 366 F.3d 72, 76 (2d Cir. 2003).  "**Malice can be inferred from lack of probable**...'" *Id. citing* Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996).

### When A Person Is Arrested And Prosecuted On Multiple Criminal Charges *Each Criminal Charge Must be Analyzed Separate* And Apart From The Others:

"The issue of arguable probable cause for the malicious prosecution claim is identical to the issue of arguable probable cause for the false arrest claim." Curanaj v. Cordone, 2012 U.S. Dist. LEXIS 135101, 29-30 (S.D.N.Y. 2012).  "However, Defendants here must have had probable cause for **each charge** for which Plaintiff was prosecuted."  Rodriguez v. New York City Police Dep't, 2011 U.S. Dist. LEXIS 122871, 13 (S.D.N.Y. 2011) Thus, for example, in New York, when an accused is arrested on multiple charges  he may proceed with a claim on the specific charges on which he was not convicted. Fulton v. Robinson, 289 F.3d 188, 197 (2d Cir. 2002) (*citing* Janetka v. Dabe, 892 F.2d 187, 190 (2d Cir. 1989). In the matter of Curanaj v. Cordone, *supra*, where the plaintiff alleged that he was arrested and charged with several crimes - some of which were false/malicious - the court correctly reasoned:

> Thus, as to the Menacing charge, the Officers had arguable probable cause and cannot be held liable for that charge. The additional charges, Criminal Possession of a Weapon in the Fourth Degree and Harassment in the Second Degree, have to be analyzed separately.

"Defendants here must have had probable cause for each charge for which Plaintiff was prosecuted." (*Citations omitted*)
Curanaj v. Cordone, at 29.

Where**,** "probable cause exist[s] to charge a plaintiff with a minor violation and police have "tacked on" more serious charges . . . in such a scenario, the Second Circuit has held that, while multiple charges may arise from a single occurrence, a finding of probable cause on the lesser charge does not prohibit the plaintiff from bringing a malicious prosecution claim as to the more serious charges." Ellis v. La Vecchia, 567 F. Supp. 2d 601, 607-608 (S.D.N.Y. 2008); *citing*, Posr, 944 F.2d at 100; *and* Janetka v. Dabe, *infra*.

### A.____With Respect To The False Arrest and Malicious Prosecution Of Plaintiff Stanley Frederique *For The Charge Of Menacing*:

At the outset, Plaintiff recognizes that a 911 call was made, and complaint was placed regarding an alleged assault, by Jasmin Johnson against Stanley and Luckelson Frederique. Accordingly, arguably, the police would have had probable cause to arrest and prosecute Stanley and Luckelson Frederique for the **alleged Assault or Reckless Endangerment charges only with regard to Ms. Johnson**. However, as for the separate and more serious menacing charge against Stanley Frederique, of which the police maliciously and falsely arrested Stanley Frederique, sufficient issues of fact exist regarding same to warrant denial of Defendants' motion. Simply put, just because the Police had arguable probable cause to arrest/prosecute Stanley for Assault on Jasmin Johnson - does not shield the police for falsely "tacking-on" and adding the false menacing charge against Stanley. *(See Id.)*

It is important to note that Jasmin Johnson recanted her statement against Stanley and Luckelson Frederique once she learned that the police were using her to advance their malicious false arrest and charges against Stanley Frederique (*See* Stmnt of Facts, Section H above; and Plaint's 56.1, Section G, ¶¶390-395). This is critical because it provides proof, or raises issues of fact, that the Defendants were aware - **well before Stanley Frederique was arrested for alleged menacing,**

20

**and while they were preparing the statement of Ms. Johnson on the date of the arrest** - that they lacked probable cause to arrest Stanley for the additional menacing charge. In her statement, among other things, Ms. Johnson wrote: "*the statements were false*" and that "*her words were changed and flipped around and tampered with to better justify the police and their wrongdoing.*" (*Exhibit L*). Jasmin also stated that she was "*insulted*" and being used as "*bait*" because the "*police needed to cover up their dirty tracks.*" (*Id.*) Ms. Johnson refused to participate in the prosecution knowing that the Defendants were (maliciously) using her to wrongfully charge Plaintiffs. (*Id.*)

Further, independent of the statement of Ms. Johnson, the Defendants knew that they lacked probable cause to arrest/prosecute Stanley Frederique for Menacing based on the facts of the incident **(*See* Plaint's 56.1 Count Stmnt, Section C[1], ¶¶338-346; and Stmnt of Facts Section E[1] above)**. Defendants "used" Jasmin Johnson to create the probable cause that they did not have. (*Id.*)

In short, the Menacing charges were intentionally fabricated by Defendants, against Stanley Frederique, knowing that this charge lacked factual and legal basis. Indeed, all of the charges against Stanley Frederique were dismissed outright **(*See* Plaint's 56.1 Count Stmnt, Section D, ¶¶369 - 372)**. The DA's Office did not need Ms. Johnson to continue the prosecution against Stanley for menacing. The menacing charge was based upon the alleged knowledge of AMT Ferrucci.**(*Id.* ¶¶339 and 361).** But, AMT Ferrucci's observations (if any) were insufficient to charge Stanley Frederique with menacing and the charge was dropped for lack of probable cause (*Id.*)

> **B.     With Respect To The False Arrest and Malicious Prosecution Of Plaintiff Luckelson Frederique For Assault and/or Attempted Assault Against Officer Harracksighn and Resisting Arrest:**

The same reasoning applied above to Stanley Frederique equally applies to Luckelson Frrederique. Aside from the initial charge of alleged Assault against Jasmin Johnson, the separate

21

and more serious felony charges of Assault, Attempted Assault, and Resisting Arrest that were maliciously "tacked-on" by the Defendants, Defendants can still be held liable for same.

Clearly, the police lacked probable cause to arrest/prosecute Luckelson Frederique for the aforementioned charges of Assault, Attempted Assault and Resisting Arrest. **(*See* Plaint's 56.1 Count Stmnt, Section C[2], ¶¶347-368; and Stmnt of Facts Section E[2] above)**.

From the outset, a claim that Luckelson was able to forcefully kick Officer Harracksingh in the knee, as well as the other officers, while laying on top of his arms is physically impossible. <u>What is even more impossible</u>, is that Luckelson Frederique would be able to "flail" his arms, as well as hold his arms underneath his body with enough strength to require several officers to pull his arms from underneath him, **<u>with a dislocated shoulder</u>**! Further, by all accounts, Luckelson was complying with the officers' commands when the jumped on him **(Id. ¶316).**

In any event, even Officer Harracksighn, who was the complainant against Luckelson Frederique, could not say that Luckelson assaulted him **(Plaint's 56.1 ¶353).** Harracksighn testified that he sustained the injury to his knee and did not know how that occurred (*Id*.). As for the claim that Luckelson barricaded himself in the home, the facts are clear that, at all times, the first-responding officers to the scene (Carbone, Cetto, and Defendant Scholl) were told that Luckelson was in the basement and could not come out because he was injured. **(*Id*. ¶¶292-299).  Police Officer Scholl confirms that he"*asked Stanley Frederique why his brother Luckelson would not come out of the basement and he stated that the  [Jasmine] broke his brother's arm and <u>his brother was unable to come to the door</u>."** (*Exhibit T*, Internal Correspondence, PO J. Scholl, dated 5/13/2010.)

As for Luckelson allegedly letting the dog loose on the officers, despite what Defendants say now in their motion, none of the Officers, or AMT Ferrucci could say that Luckelson sent the dog to attack them. **(Id. ¶¶354-361).**

22

Finally, the charges against Luckelson were dismissed outright - even though the Defendants' police officers remained ready and willing to testify to the same above-facts against Luckelson (*Id.* ¶¶369-372).

C.     **Defendants' Police Officers *Collectively* Initiated and Continued The False Arrests And Malicious Prosecutions Of Plaintiffs Stanley And Luckelson Frederique:**

"To satisfy the first element of a malicious prosecution claim (that the defendant initiated or continued the criminal proceedings against the plaintiff), 'it must be shown that the defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act'." Mitchell v. Victoria Home, 434 F. Supp. 2d 219, 227 (S.D.N.Y. 2006), *citing* DeFilippo v. County of Nassau, 583 N.Y.S.2d 283, 284 (2d Dept.1992). **Further, with regard to civilians and/or "lay persons" other than police officers** (such as Defendants herein), "one who does no more than disclose to a prosecutor all material information within his knowledge is not deemed to be the initiator of the proceeding." *Id.*, *citing*; Present v. Avon Prods., Inc., 687 N.Y.S.2d 330, 335 (1st Dept.1999).

**"Of course, the standard is different for law enforcement officers than it is for laymen."**[*emphasis supplied*] Mitchell v. Victoria Home, *supra.* **"In malicious prosecution cases brought against police officers, plaintiffs can demonstrate that officers initiated criminal proceedings by having the plaintiff arraigned, by filling out complaining and *corroborating affidavits*, and by signing felony complaints."** Llerando-Phipps v. City of New York, 390 F.Supp.2d 372, 383 (S.D.N.Y.2005). Again, "the standard is different for law enforcement officers." In malicious prosecution cases against police officers, plaintiffs have met this first element by showing that officers, *inter alia*, "***filled out complaining and corroborating affidavits.***" Carter v. Port Auth. of New York & New Jersey, 2004 WL 2978282, *8 (S.D.N.Y. Dec.20, 2004).

23

This is exactly what is alleged and proven by Plaintiffs. Here, the documents and statements that were used to support the criminal actions against Stanley and Luckelson were based upon the false allegations made by Collective police officers - who all falsely assert that Plaintiffs barricaded themselves in the home, threatened to release a dog on officers, and/or resisted arrest. Certainly, Defendants' Officers cannot be shielded from liability for these actions. Defendants herein attempt to have this Court apply the lay person standard to their actions. However, "**applying the layperson standard to the police would mean that law enforcement officers would never be liable for malicious prosecution**." Mitchell v. Victoria Home, *supra*.

"No arrest, no matter how  objectively reasonable, gives an arresting officer or his fellow officers a license to deliberately manufacture false evidence against an arrestee."Ricciuti, *supra*. "The continuation of a criminal proceeding without probable cause amounts to malicious prosecution." *Id*. Basset v. Ferrucci, 1996 U.S. Dist. LEXIS 8667, 13-15 (N. D.N.Y. 1996); *citing,* Callan v. State, 73 N.Y.2d 731, 535 N.Y.S.2d 590,(1988).

## II.
## DEFENDANT SCHOLL IS LIABLE FOR HIS FAILURE TO ACT OR PREVENT THE WRONGFUL ACTIONS TAKEN AGAINST PLAINTIFF LUCKELSON FREDERIQUE

In **Point I, sections 7, 8, 9 and 10** of Defendants' motion, Defendants assert that Defendant Scholl lacked personal involvement in the shooting of Plaintiffs' dog, te property damage to Plaintiffs' house, and the Trespass into Plaintiffs' home. In this regard, Defendants claim that since Defendant Scholl did not discharge his weapon, or enter Plaintiffs' property, Defendant Scholl lacks "personal involvement" in these actions that caused injuries to Plaintiffs. However, Plaintiffs assert that this is an issue of fact for the reasons stated below.

"Personal involvement is a prerequisite to a finding of liability under § 1983." Wong v. Yoo, 649 F. Supp. 2d 34, 61 (E.D.N.Y. 2009), *citing;* Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994).

24

"Personal involvement may be established by a showing of direct participation, meaning 'intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal'." (*Id.*, *citing; Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir.2001). **"Personal involvement is also established where police officers fail 'to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence'."** *Id.*, *citing; Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.1994); and *Jeffreys v. Rossi*, 275 F.Supp.2d 463, 474 (S.D.N.Y.2003).

"Failure to intervene" cause of action does not itself state a separate constitutional violation. Rather, it is a means through which to hold additional defendants accountable for the violations committed by their co-defendants, given the duty of all law enforcement officials to prevent constitutional violations." *Hickey v. City of New York*, 2004 WL 2724079, at *16 (S.D.N.Y. 2004)"For liability to attach to that officer, however, 'there must have been a realistic opportunity to intervene to prevent the harm from occurring,' **an assessment of the existence of such a 'realistic opportunity' for intervention and prevention is left to the fact-finder's determination**." *Id.*, *see also*, *Universal Calvary Church v. City of New York*, 2000 WL 1538019, at *9 (S.D.N.Y. 2000).

As stated above, it is beyond dispute that Defendant Scholl was one of the first officers to respond to the scene after the 911 calls were placed to the police. Officers Carbone and Cetto handed Stanley Frederique off to Defendant Scholl for transport back to the precinct following his arrest. According to Stanley, Stanley Frederique was made to sit out in front of his home, in a police car of Defendant Scholl, **for hours** while in pain from his surgery, which he underwent just hours before.. **(Plaint. 56.1 ¶124).** Further, Stanley was sitting in Defendant Scholl's car when the gunshots occurred and so it is beyond dispute that Stanley was in Defendant Scholl's car while all the events unfolded in the Frederique home.

25

While sitting in the police car of Defendant Scholl for hours, with Defendant Scholl in the front seat, Stanley Frederique continued to tell Defendant Scholl (as well as officers Carbone and Cetto) that Luckelson was not barricaded in the home and that Luckelson injured and was waiting in the basement for medical attention. **(See Plaint's 56.1 ¶¶290, 294).** Stanley kept asking officer Scholl to help Luckelson. Defendant Scholl confirms **that he"*asked Stanley Frederique why his brother Luckelson would not come out of the basement and he stated that the [Jasmine] broke his brother's arm and his brother was unable to come to the door."*** (*Exhibit T*, Internal Correspondence, PO J. Scholl, dated 5/13/2010.).

Given the fact that Defendant Scholl admits that he was aware that it was not a barricade situation and that Luckelson could not come out because he was waiting for medical assistance in the basement, a reasonable jury could find that Defendant Scholl's (as well as officers Carbone's and Cetto's) failure(s) to act by: [1] withholding this information, [2]allowing the police to continue to treat this as a barricade situation, and [3] refusing to allow Paul Frederique and Marleana to go and secure the dog, directly caused and/or substantially contributed to the shooting, the property damage, the death of Angel, the invasion into the home, and the assault and arrest of Luckelson Frederique.

Clearly, Defendant Scholl (Carbone and Cetto) had "realistic opportunity' for intervention and prevention" at a time when they could have shared this information with the other officers and/or investigated further to see if Stanley's, Pauls', and Marleana's statements were true. Hickey v. City of New York, *supra*. In fact, Defendant Scholl (as well as officers Carbone and Cetto) failed to share this information after Stanley and Luckelson were arrested and charged with crimes. This failure to disclose exculpatory information contributed to the ongoing malicious prosecutions of Plaintiffs Stanley and Luckelson. Defendant Scholl's personal involvement is an issue of fact that should be decided by a jury. "An officer who merely observes or assists in an arrest, even if he is not the

26

'arresting officer' may be liable for failing to intercede to prevent an arrest without probable cause." Genia v. Parker, 2007 U.S. Dist. LEXIS 19700, 17 (E.D.N.Y. 2007).

"Personal involvement may be established by a showing of direct participation, meaning 'personal participation by one who has knowledge of the facts that rendered the conduct illegal,' or indirect participation 'such as ordering or helping others to do the unlawful acts'." Celestin v. City of New York, 581 F. Supp. 2d 420, 429 (E.D.N.Y. 2008), *citing*; Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir.2001). *See for example*, Gagnon v. Ball, 696 F.2d 17, 21 (2d Cir. 1982) (one defendant officer not only declined to intercede on the plaintiff's behalf but also assisted the other officer in detaining plaintiff). "**An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official.**" Anderson v. Branen, *supra*, at 557.

Here, sufficient issues of fact exist as to Defendant Scholl's personal involvement and failure to intervene in the violations of Plaintiffs' rights and the resulting extreme damage caused thereby.

### III
### ISSUES OF FACT EXIST AS TO PLAINTIFFS' STANLEY AND LUCKELSON FREDERIQUES' EXCESSIVE FORCE CLAIMS

In **Point I, section 11** of Defendants' motion, Defendants assert that there is no evidence that excessive force was used. Plaintiffs disagree.

"In order to establish that the use of force to effect an arrest was unreasonable and therefore a violation of the Fourth Amendment, plaintiffs must establish that the government interests at stake were outweighed by the nature and quality of the intrusion on [plaintiffs'] Fourth Amendment interests." Amnesty America v. Town of West Hartford, 361 F.3d 113, 123 (2d Cir. 2004)(*internal*

27

*quotation omitted*); <u>Graham v. Connor</u>, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

"In other words, the fact finder must determine whether, in light of the totality of the circumstances faced by the arresting officer, the amount of force used was objectively reasonable at the time." *Id*. at 123; *Id*. at 397, 109 S.Ct. 1865.  The inquiry therefore requires careful attention to the facts and circumstance of each particular case, including: 1) the severity of the crime at issue; 2) whether the suspect poses an immediate threat to the safety of the officers or others; 3) and whether he is actively resisting arrest or attempting to evade arrest by flight.  *Id*. at 396, 109 S.Ct. 1865."**If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe**."  <u>Robison v. Via</u>, 821 F.2d 913, 924 (2d Cir. 1987).

A.   <u>**As For Stanley Frederique**</u>
     (*See* **Point V(B) below for further arguments/support**)

With regard to Plaintiff Stanley Frederique, it is important to note that all Parties agree that Stanley Frederique did not resist arrest when he was told that he was under arrest. **(Plaint's 56.1 stmtnt. ¶¶286-288;** *see also* **Def's 56.1 ¶65).** While being placed under arrest, Stanley continued to question why he was being arrested, while telling the police that he was the person that called 911 and that Luckelson Frederique was in the basement in need of medical assistance. **(*Id*.¶¶290-293)** Stanley Frederique also told the officers that he just had surgery hours before, that he had electrodes from his surgery still attached to his body, that he needed his pain medication for his surgical wounds, and that he was in pain.**(Id ¶289, 406).**

Despite Stanley's nonresistance, his pleas to the officers were met with unwarranted physical force. Officers Carbone and Cetto and/or Defendant Scholl ignored Stanley Frederique and told him to get up against the wall. **(Id. ¶286.)** Stanley explained to the officers (including Defendant Scholl) that he just had surgery. Nevertheless, the police roughly "took [him] and threw [him] up against the

28

gate," which caused his face to hit the gate. Stanley testified that he sustained an injury to his face as a result. Stanley was also "*punched in his back when [he] just had surgery*." Then the police began searching Stanley Frederique and placed him in handcuffs. (*Id.*). Stanley Frederique was in pain due to the officers manhandling him after he just had his surgery. (*Id* ¶289) Stanley Frederique was crying in pain and asking for his medication at the time (*Id*.). He was made to sit in the car with Defendant Scholl, who remained indifferent to his pain "for hours," with surgical wounds, electrodes attached to his body, and without his pain medication. *(Id* ¶124).

**B.    As For Luckelson Frederique**
   (*See* **Point V(B) below for further arguments/support**)

Luckelson Frederique denies that he attacked any of the officers. Nevertheless, the officers "*literally beat the soul out of his body*."(**Plaint's 56.1 ¶¶317-321**). Luckelson recalls asking an African American officer why they were hitting on him. In response, the officer replied "*shut up nigger*" and punched Luckelson in the face. (*Id*.) Defendant Officer Rosario then kicked Luckelson in the face. Rosario was "*pounding Luckelson's face with his feet*." (*Id*.) Luckelson was also kicked in the ear and felt punches to his face. Defendant Officer Rosario kicked Luckelson in his head/face area twice. (*Id*.) One officer put his foot on top of Luckelson's head and stood on Luckelson's head for several seconds. Several officers were kicking and punching Luckelson while he laid on the ground. (*Id*.) The officers kicked Luckelson in his "legs, arms and back." (*Id*.) **They were also kicking Luckelson in his dislocated shoulder**. (*Id*.) The entire time, Luckelson was screaming "*help. Please*." (*Id*.)

Clearly, contrary to Defendants' contentions in their motion, there is evidence of excessive force against Plaintiffs Luckelson and Stanley Frederique. Plaintiffs have established their excessive force claims and numerous issues of genuine material fact are in dispute, preventing summary

29

judgment. Furthermore, the Court, in <u>Terranova v. Torres</u>, found that in excessive force cases under the Fourth Amendment, summary judgment should rarely be granted, even though a jury might ultimately reject the Plaintiff's version of the facts.  *Id*. at 603 F.Supp.2d 630, 631, 632 & n.3 (S.D.N.Y. 2009).

**IV.**
**PLAINTIFF CAN SUSTAIN A CAUSE OF ACTION FOR DEFAMATION AGAINST THE COUNTY OF NASSAU FOR THE FALSE STATEMENTS OF ITS OFFICERS**

In **Point I, section 13** of Defendants' motion, Defendants assert that Plaintiffs' cause of action for defamation should be dismissed. Plaintiffs disagree, particularly with respect to Defendant Rosario.

"The elements of a cause of action for defamation are a false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, and it must either cause special harm or constitute defamation *per se*" <u>D'Amico v Correctional Med. Care, Inc</u>., 120 A.D.3d 956, 962-963 (4th Dep't 2014). *citing*, <u>Salvatore v Kumar</u>, 45 AD3d 560, 563, 845 NYS2d 384. For example, "an allegation that a defendant filed a false report accusing the plaintiff of a serious crime is sufficient to state a valid cause of action to recover damages for libel per se" <u>Id</u>., *citing*, <u>Burdick v Verizon Communications,</u> 305 AD2d 1030, 1031, 758 NYS2d 877 [2003]; <u>Geraci v Probst,</u> 15 NY3d 336, 344-345 [2010].

With regard to Defendant Officer Rosario, there is no doubt that Defendant Rosario "filed a false report accusing the plaintiff [Luckelson Frederique] of a serious crime ." (*See Exhibit W*, statement of P.O. H Rosario, dated 6/16/2010). Further, Rosario's "false report" was made to the Nassau County Police Department and *was not initially* created for the purpose of the prosecution against Luckelson Frederique and/or was published for purposes outside of an official court proceeding. (*Id*.) As such, Defendant Rosario cannot claim that this false statement was privileged. In his report, Rosario falsely accuses Luckelson Frederique of the crimes of resisting arrest; refusing multiple orders to put his hands

30

behind his back; kicking his legs to avoid arrest; etc. (*Id*.). Luckelson Frederique claims (and the evidence supports that) these statements of criminal activity are false. As such, issues of fact exist as to whether Defendant Rosario is liable for defamation *per se* as to Luckelson Frederique.

## V.
## DEFENDANTS ROSARIO AND SCHOLL ARE NOT ENTITLED TO QUALIFIED IMMUNITY

"Qualified immunity 'shields governmental agents 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known'." McEvoy v. Spencer, 124 F.3d 92, 97 (2d Cir. 1997) ( *quoting* Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). When addressing claims of qualified immunity, courts first focus on the issue of whether the constitutional right that was violated was clearly established. Saucier v. Katz, 533 U.S. 194, 201 (2001).

Assuming the facts establish the violation of a clearly established constitutional right, Defendants would still be entitled to qualified immunity if their actions were objectively reasonable "in light of the legal rules that were clearly established at the time." Anderson v. Creighton, *supra* at 639 (1987). In order to assess whether the actions of Defendants were objectively reasonable, the Court examines the information they possessed at the time of their actions "without consideration of [their] subjective intent." Connecticut ex rel. Blumenthal v. Crotty, 346 F.3d 84, 106 (2d Cir. 2003). **Where, however, the objective reasonableness of an officer's actions depends on disputed facts, summary judgment based on qualified immunity is properly denied.** Rivera v. United States, 928 F.2d 592, 607 (2d Cir.1991); Brawer v. Carter, 937 F.Supp. 1071, 1082 (S.D.N.Y.1996).

### A.    Defendant Rosario Is Not Entitled to Qualified Immunity For False Arrest Or Malicious Prosecution Against Plaintiff

Plaintiffs respectfully incorporate by reference the arguments and facts set forth in Point I above. First, Plaintiffs' right to be free from an unlawful arrest and malicious prosecution is clearly

31

established. <u>Cook v. Sheldon</u>, 41 F.3d 73, 78-79 (2d Cir. 1994). Clearly, there was no probable cause to arrest, charge, accuse, and/or support false criminal allegations against Plaintiff Luckelson Frederique - alleging felonies such as menacing police officers, assaulting police officers, and/or resisting arrest. Defendant Rosario should not be entitled to qualified immunity.

Second, based upon the facts outlined in Plaintiffs' 56.1 Counter Statement, a reasonable jury could conclude that Defendants' Rosario's actions against Plaintiff (in furthering the prosecution of Plaintiff without probable cause along with the other police officers) **were not** objectively reasonable. Inasmuch as issues of fact exist as to whether Defendant Rosario's actions were objectively reasonable, Defendant Rosario is not entitled to Qualified  Immunity. *Infra*.

> **B.      Defendants Rosario And Scholl Are Not Entitled
> to Qualified Immunity For Excessive Force**

Plaintiff incorporates by reference, the arguments and facts set forth in **Point III** above. Given Defendants' admission that Stanley Frederique did not resist arrest in anyway, Defendant Scholl cannot be entitled to qualified immunity under the circumstances. Knowing that Defendant Stanley Frederique did not resist arrest, and that Stanley was injured and in pain because he had just came from surgery, the amount of force applied on him by Defendant Scholl, along with officers Carbone and/or Cetto, was unreasonable and excessive.  **"Under the law, police are not permitted to use any degree of force in all instances—in some circumstances, no use of force is reasonable because none is required.**" [*emphasis ours*] <u>Weather v. City of Mount Vernon</u>, 2011 WL 1046165, 11 (SDNY. 2011).

"A plaintiff, need not sustain a severe injury to maintain a claim that the use of force was objectively unreasonable under the Fourth Amendment." <u>Breitkopf v. Gentile</u>, 41 F. Supp. 3d 220, 242-243 (E.D.N.Y. 2014)*, citing:* <u>Maxwell v. City of New York</u>, 380 F.3d 106, 108 (2d Cir. 2004).

As for Luckelson Frederique, as issues of fact exist as to whether Luckelson resisted arrest, and/or was subjected to excessive force by Defendant Rosario, along with others, Defendant Rosario should not be entitled to qualified immunity. "If the material facts underlying Plaintiffs' claims were in dispute, time and again Second Circuit has recognized that the District Court may only determine whether Defendants are entitled to qualified immunity **after the jury had resolved these factual disputes**" [*emphasis added*]. *See, e.g.,* Kerman, 374 F.3d at 109; Cowan v. Breen, 352 F.3d 756, 764-65 (2d Cir. 2003). "When the availability of qualified immunity turns on the disputed underlying material facts, not on the reasonableness of actions taken in undisputed factual circumstances, "jury consideration is normally required." Lennon v. Miller, 66 F.3d 416, 421 (2d Cir.1995).

## VI
## ISSUES OF FACT EXIST AS TO PLAINTIFFS' MUNICIPAL LIABILITY CLAMS

A municipality can be held liable under 42 U.S.C. § 1983 for unconstitutional violations by its employees if the alleged unconstitutional action "implements or executes a policy statement, ordinance, or regulation, or decision officially adopted and promulgated by the [municipality's] officers or even without formal governmental approval is visited pursuant to governmental custom." Green v. City of New York, 453 F.Supp.2d 690, 726 (S.D.N.Y. 2006)(*citing* Monell v. Department of Social Services, 436 U.S. 658,  690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611(1978).

"Here, since the actual physical abuse was allegedly committed by subordinate municipal employees, "municipal liability turns on the plaintiff['s] ability to attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policymaking authority." Gashi v. County of Westchester, 2005 U.S. Dist. LEXIS 1215, 39-43 (S.D.N.Y. 2005). One "method of implicating a policymaking official through subordinates' conduct is to show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the

33

actions." (*Id*.) That is, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city 'policy or custom' that is actionable under § 1983." (*Id*.)

"The Court of Appeals has instructed that 'a [municipal] employee's single tortious decision  or course of action… may be said to represent the conscious choices of the municipality itself . . .to constitute the act of the municipality and therefore provide a basis for municipal liability . . . if it is taken by, or is attributable to, one of the municipality's authorized policymakers." <u>Gashi</u>, *supra*, *citing;* <u>Amnesty America v. Town of West Hartford</u>, *supra at* 126. In <u>Michael v. County of Nassau</u>, the District Court found that an informal custom "of at least tolerating police misconduct" and/or a failure to properly train police officers could be inferred where ***a single incident*** the alleged conduct took place over several hours . . .and **several officers participated in the repeated denials of the plaintiff's rights**. 2010 WL 3237143, at \*4 (EDNY 2010); *see also*, <u>Castilla v. City of New York</u>, 2012 WL 3871517 (SDNY,2012) (Where the plaintiff's allegations that she was repeatedly victimized by multiple officers during the same incident was sufficient to sustain a *Monell* claim).

Plaintiffs' complained to the Nassau County Police Department about its officers' actions against their dog Angel, wherein Plaintiffs' dog was brutally killed, Plaintiffs' home was shot-up and riddled with bullets, and surrounding properties/neighbors' homes. **(Plaints' 56.1, Section J, ¶¶434;** *see also Exhibit S,* various photographs of Frederique residence). **Indeed, <u>the officers' bullets caused damage to a nearby nursery school</u>** (*Exhibit A*, S. Frederique Depo. 155:4-11). The officers' actions are even more egregious given officer Carbone's and Detective Rogan's testimonies that, *inter alia:* **[1]** the officers took no action to ensure that the dog was secured; **[2]** the officers took no steps to try to secure the dog before the dog came out of the home; **[3]** no one allowed Plaintiffs to secure the dog

34

as they <u>repeatedly</u> requested; **[4]** where there is a dog present at the scene, "*usually, [the police] ask them to place [the dog] in a room prior to us entering;*" and no one gave this instruction to the Frederiques; and **[5]** if there is an alleged dangerous dog on the scene, ESU is usually called - "*they have tranquilizer guns - ESU has the proper training to deal with dogs*." (<u>Id</u>.) **(Plaints' 56.1, Sections K and L, ¶¶435-442)**.

The Nassau County Police Department conducted a (purported) investigation into the shooting aspect of the incident. **(Plaints' 56.1, Section J, ¶¶434;** *Exhibit M*). Among the people engaged in this investigation was the "Deputy Office Chief" and the "Chief" - **top policymakers** in the Nassau County Police Department. (*Exhibit M*). These policymakers **"endorsed" and "concurred"** that the officers were "*justified in using the force that was used*" and that the "*first round as well as the last expended was necessary and reasonable.*" Thus, these policymakers determined that it was proper for the officers to fail to use reasonable efforts to secure the dog (while preventing Plaintiffs from securing the dog) before shooting ***43 bullets*** in a fashion that was so uncontrolled that Plaintiffs' house was riddled with bullets (*Exhibit S*), Plaintiffs' neighbors' homes were hit with bullets, and neighboring nursery schools were also hit. (*See Exhibit M*, page 2).

Here, Plaintiffs show evidence of a failure to supervise. The above raises issues of fact about the County's a failure to investigate, retrain, or discipline its officers in the wake of a possible egregious or unusually brutal incident. The severity of the incident, the failure to investigate, retrain, or discipline, and the Chief's approval of the incident provide sufficient indication of a failure to supervise such that summary judgment on this issue would be premature. *See,* Greenaway v. Cnty. of Nassau, 2015 U.S. Dist. LEXIS 43037, 29-30 (E.D.N.Y. 2015).

**CONCLUSION**

For all the above reasons, Defendants' motion for summary judgment should be denied.

35

Dated:      Hempstead, New York
            May 4, 2015

                              Respectfully Submitted,

                              _____/S/_____
                        By:   FREDERICK K. BREWINGTON
                              GREGORY CALLISTE, JR
                              LAW OFFICES OF
                              FREDERICK K. BREWINGTON
                              556 Peninsula Blvd.
                              Hempstead, New York 11550

36