UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

STANLEY FREDERIQUE, LUCKELSON FREDERIQUE, ELINE FREDERIQUE, and PAUL FREDERIQUE,

**MEMORANDUM AND ORDER**
11-CV-1746 (SIL)

Plaintiffs,

-against-

COUNTY OF NASSAU, POLICE OFFICER HECTOR ROSARIO, and POLICE OFFICER JASON SCHOLL, in their individual and official capacities,

Defendants.

---------------------------------------------------------------X

**LOCKE, Magistrate Judge:**

Plaintiffs Stanley Frederique, Luckelson Frederique, Eline Frederique, and Paul Frederique (collectively, the "Plaintiffs" or "Frederiques") bring this action against Defendants County of Nassau, Police Officer Hector Rosario, and Police Officer Jason Scholl (collectively, the "Defendants"), alleging causes of action arising under 42 U.S.C. § 1983 and New York common law. *See* DE [45]. According to Plaintiffs, Nassau County Police Department ("NCPD") officers violated their rights while responding to an April 8, 2010 domestic disturbance complaint at Plaintiffs' home in Elmont, New York (the "Frederique Home"). *Id.* Presently before the Court is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56, which

1

Plaintiffs oppose. *See* DEs [57], [58]. For the reasons set forth herein, Defendants' motion is granted in part and denied in part.[1]

## I. BACKGROUND

### A. <u>Relevant Facts</u>

The following facts are taken from Defendants' Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Defs.' 56.1 Stmt."), DE [57-4]; Plaintiffs' Statement of Disputed Facts in Opposition to Defendants' Motion for Summary Judgment Pursuant to Local Rule 56.1 and Plaintiffs' Counter-Statement of Facts ("Pls.' 56.1 Stmt."), DE [57-6]; the Declaration of Ralph J. Reissman in Support of Defendants' Motion for Summary Judgment (the "Reissman Decl."), DE [57]; and the Declaration of Gregory Calliste, Jr. in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (the "Calliste Decl."), DE [58-1].[2]

#### 1. <u>The April 8, 2010 Altercation</u>

At all relevant times, Plaintiffs Paul and Eline Frederique co-owned the Frederique Home, where they lived with their four sons, Stanley, Luckelson,

---

[1] This case was previously assigned to the Honorable Sandra J. Feuerstein. Pursuant to 28 U.S.C. § 636(c), the parties filed an executed Notice, Consent, and Reference of a Civil Action to a Magistrate Judge, indicating their intention to have this Court "conduct all proceedings and order the entry of a final judgment," which Judge Feuerstein So Ordered on June 18, 2013. *See* DE [28]. As a result, the instant dispositive motion is presently before this Court for a final decision.

[2] The Court notes that, although Plaintiffs purport to dispute certain allegations and facts contained in Defendants' Rule 56.1 Statement, certain of Plaintiffs' disputes are non-responsive, and in many instances, not actually supported by the facts cited. Moreover, other purported disputes are not supported by citations to the record evidence. In such instances, Defendants' allegations and facts are treated as undisputed. *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2011) ("Where there are no citations or where the cited materials do not support the factual assertions in the Statements, the court is free to disregard the assertion.") (internal alterations omitted).

McGregor, and Luckner. Defs.' 56.1 Stmt. ¶¶ 9-18. During the day on April 8, 2010, McGregor and his girlfriend, Jasmine Johnson ("Johnson"), left their two-year old daughter Zoe at the Frederique Home so that Luckelson could care for her while they went out for the evening. *Id.* at ¶ 25; Pls.' 56.1 Stmt. ¶ 268. When McGregor and Johnson returned at approximately 10:00 p.m., Luckelson, Stanley, and Stanley's girlfriend, Marleana Neeper ("Marleana"), were outside with Zoe, who was in her stroller without socks or a jacket. Defs.' 56.1 Stmt. ¶¶ 26-27. Jasmine immediately began to argue with Stanley, Luckelson, and Marleana about Zoe's care. *Id.* at ¶¶ 28-30; Pls.' 56.1 Stmt. ¶ 268. When Stanley and Luckelson told Johnson to leave, an altercation ensued and Johnson began hitting Luckelson in his face and chest. Defs.' 56.1 Stmt. ¶¶ 29-30.

During the altercation, Luckelson went into the house to fill a vase with water, came back outside, and threw the water on Johnson. *Id.* at ¶ 33. Johnson rushed at Luckelson, knocking him to the ground, and dislocating his right shoulder. *Id.* at ¶ 35. Although it is undisputed that Johnson suffered a laceration to her skull and ear, the parties dispute the manner in which it occurred. According to Defendants, after throwing water on Johnson, Luckelson broke the vase over her head, causing the laceration. *Id.* at ¶ 34. Plaintiffs deny that Luckelson broke the vase over Johnson's head and claim that she sustained the laceration when she fell to the ground after charging at Luckelson. Pls.' 56.1 Stmt. ¶¶ 34, 275-76.

Stanley and Marleana brought Luckelson to his bedroom in the basement and went back outside. Defs.' 56.1 Stmt. ¶ 36. At that time, the Frederiques' pet pit bull

Angel was in the basement with Luckelson. *Id.* at ¶ 39. Although Plaintiffs claim that Stanley called the police first in order to request medical attention for Luckelson, Stanley testified that he did not actually speak with a dispatcher or tell anyone that Luckelson required medical attention. Pls.' 56.1 Stmt. ¶ 282; *see also* Reissman Decl. Ex. AW at 91:20-24. It is undisputed that Johnson called the Nassau County 911 emergency telephone line at 10:18 p.m., stating that she required an ambulance and informing the dispatcher that her "daughter's uncles" punched her in the face and tried to hit her daughter. *See* Defs.' 56.1 Stmt. ¶ 40. At 10:22 p.m., Johnson called back, stating that her "boyfriend's brother" hit her in the head with a glass and that her head was bleeding. *Id.* at ¶ 41. According to Johnson, "Stanley started it." *Id.*

### 2. Nassau County Police Department Arrives

The parties' versions of what happened after the NCPD arrived are substantially different. Accordingly, the Court addresses both versions in turn.

#### i. *Defendants' Version*

At approximately 10:22 p.m., Ambulance Medical Technician Brian Ferrucci received a radio dispatch for a domestic incident requiring medical attention at the Frederique Home. *Id.* at ¶ 45. When Ferrucci arrived, he observed pieces of a shattered vase in the street and saw Johnson in front of the house, bleeding from her head. *Id.* at ¶ 46. Johnson told Ferrucci that Stanley and Luckelson had struck her in the head with a vase, and that they were in the basement. *Id.* at ¶ 47. As Ferrucci spoke with Johnson, he heard the house's side door opening and closing from behind a fence. *Id.* at ¶ 48. When Ferrucci asked the men behind the fence to come outside

and speak with him, a male voice responded, "Don't come near the fence I'll let the dog out on you." *Id.* Johnson informed Ferrucci that there was a pit bull in the house. *Id.* at ¶ 50. Ferrucci told the men to secure the dog and he called for police assistance. *Id.*

When Officers Anthony Carbone, Gregory Tristan Cetto, and Jason Scholl arrived, Johnson identified Stanley as one of the men who attacked her. *Id.* at ¶¶ 64, 119-20, 150. Scholl patted Stanley down to check for weapons, and Carbone placed Stanley in handcuffs. *Id.* at ¶ 123. Scholl then put Stanley in the back of Carbone's police vehicle, and remained with him for approximately one hour before taking him to the police station for arrest processing. *Id.* at ¶¶ 123-24. Sergeants Joseph Pizzimenti and Christopher Barricelle instructed Officers Carbone, Timothy Siar, Hector Rosario, Kerry Harracksingh, and Sean McNeill to establish a perimeter around the house and surrounding area to prevent Luckelson or anyone in the house from escaping. *Id.* at ¶¶ 68, 181. Officers Carbone and Siar were in the backyard, Officer McNeill was at the front of the driveway, and Officers Rosario and Harracksingh were several houses down. *Id.* at ¶¶ 68, 80, 102, 169. Shortly after establishing a perimeter, the house's side door opened and a pit bull came out. *Id.* at ¶ 69. Carbone yelled, "grab your dog," but it began running toward him. *Id.* The dog changed its course several times, running at Sergeant Pizzimenti and Officers Carbone, Siar, and McNeill, each of whom fired his gun multiple times until they killed the dog. *Id.* at ¶¶ 139-40, 171, 199. In total, Carbone fired fifteen shots, Siar fired thirteen shots, McNeill fired eleven shots, and Pizzimenti fired four shots. *See*

Reissman Decl. Ex. R. An April 19, 2010 NCPD Firearm Discharge Investigation (the "Firearm Discharge Report") concluded that, "[a]s long as the imminent threat from the pit bull continued to jeopardize the safety of the officers, the first round [of gunshots] as well as the last round expended was necessary and reasonable." *Id.*

After shooting the pit bull, several officers ran toward the side door from which it had been released. *See* Defs.' 56.1 Stmt. ¶¶ 55, 81, 103, 156. Pizzimenti told Luckelson to come out of the house with his hands up and get on the ground. *Id.* at ¶ 82. When Luckelson did not comply, Pizzimenti, Barricelle, Rosario, Harracksingh, Siar, and Cetto entered the home, following Luckelson down the stairway into the basement. *Id.* at ¶ 83. Although officers ordered Luckelson to put his hands behind his back, he dropped to the ground on his stomach and put his arms under his body. *Id.* at ¶ 84. As Rosario, Harracksingh, and Pizzimenti attempted to handcuff Luckelson, Luckelson struggled with the officers, kicking and flailing his arms and legs. *Id.* at ¶ 85. The officers eventually gained control and placed Luckelson in handcuffs. *Id.* at ¶¶ 86, 202.

Once in handcuffs, the officers brought Luckelson upstairs, and Ferrucci evaluated him, observing only a minor laceration on the fifth digit of Luckelson's left hand. *Id.* at ¶ 57. Thereafter, Officers Rosario and Harracksingh brought Luckelson to Winthrop Hospital to undergo a "Fit for Confinement" evaluation. *Id.* at ¶ 88. Officer Scholl brought Stanley to the Fifth Precinct for arrest processing. *Id.* at ¶¶ 124-25.

According to Plaintiffs, the NCPD arrived approximately twenty to thirty minutes after Stanley placed his call and immediately began asking about stray guns and drugs. Pls.' 56.1 Stmt. ¶¶ 283-84. Stanley and Marleana told the officers that Luckelson was in the basement and required medical attention. *Id.* at ¶¶ 290-92. Officers Carbone and Scholl told Stanley to get against the wall, threw him against the gate, and punched him in his back where he had surgery earlier that day. *Id.* at ¶ 286. At the officers' instruction, Paul called Luckelson on his cell phone and told him to come upstairs. *Id.* at ¶ 293.

Believing that the police had responded to provide medical attention, Luckelson slowly made his way up the stairs, with Angel following behind him. *Id.* at ¶¶ 295-97, 307. When Luckelson opened the side door, Angel walked out. *Id.* at ¶ 308. Within a few seconds of opening the door, Luckelson heard gunshots erupt, causing him to instinctively close the door and retreat into the stairway leading into the basement. *Id.* at ¶ 310. Officers Pizzimenti, Harracksingh, Barricelle, Carbone, and Rosario entered the home and followed Luckelson into the basement. *Id.* at ¶ 315. Luckelson told the officers he was unable to put his hands up because his right shoulder was dislocated, but in an attempt to comply with their orders, he dropped to the ground to be handcuffed. *Id.* at ¶¶ 315-16.

While on the ground, Rosario kicked Luckelson in the head and face twice, one officer stood on his head for several seconds, and several officers kicked and punched Luckelson in his legs, arms, back, and dislocated shoulder. *Id.* at ¶¶ 319-21.

According to Luckelson, he was punched and kicked a total of sixty to ninety times and blood was "gushing" from his ear "like a waterfall." *Id.* at ¶ 410. Luckelson heard an officer shout, "search the house for drugs," and officers opened drawers, lifted the bed, and punctured a hole in the ceiling. *Id.* at ¶ 322. Officers then went upstairs and began to search other rooms of the house. *Id.* at ¶¶ 381-89. Although it is undisputed that Paul executed a Consent to Search Form, Plaintiffs argue that he signed it after the officers had already searched the house, and that he signed it under duress. *Id.*

### 3. Criminal Charges and Prosecution

#### i. *Stanley Frederique*

Stanley was charged with: (i) one count of menacing in the second degree in violation of N.Y. Penal Law § 120.14 for threatening to release the pit bull and telling Ferrucci, "move away from the fucking door before I let the dog go"; and (ii) one count of endangering the welfare of a child in violation of N.Y. Penal Law § 260.10 for having a physical confrontation with Johnson in front of Zoe, who was not wearing shoes, socks, or a coat. Defs.' 56.1 Stmt. ¶ 226-27; *see also* Reissman Decl. Exs. V, W. In NCPD Form 79SJ Physical Condition Questionnaires completed following his arrest, Stanley attested that he was in good health, that he did not have any injuries, and that he did not require medical attention. Defs.' 56.1 Stmt. ¶¶ 229-30; *see also* Reissman Decl. Exs. X, Y. Stanley disputes that he signed any document stating that he was in good health, and alleges that he continued to request medical assistance. Pls.' 56.1 Stmt. ¶ 229.

On April 12, 2010, the Nassau County District Attorney issued an Order of Protection against Stanley on Johnson's behalf, and requested to speak with Johnson about the charges against Stanley. Defs.' 56.1 Stmt. ¶ 233. Johnson repeatedly refused to assist in prosecuting Stanley, and in a November 8, 2010 Dismissal Memorandum, Assistant District Attorney Karen Finley wrote that, without Johnson's assistance, the prosecution would be unable to prove either charge pending against Stanley. *Id.* at ¶ 234. Accordingly, on November 9, 2010, the charges pending against Stanley were dropped in their entirety. *Id.* at ¶ 235.

### ii. *Luckelson Frederique*

During Luckelson's Fit for Confinement evaluation at Winthrop Hospital, he complained of shoulder pain and a laceration on his right middle finger. *Id.* at ¶ 237. Luckelson did not complain that he had been kicked in the ear, face, or head. *Id.* at ¶ 238. Luckelson was deemed fit for confinement, and Rosario and Harracksingh brought him to the Fifth Precinct, where he was charged with: (i) one count of assault in the second degree in violation of N.Y. Penal Law § 120.05(2) for breaking a vase over Johnson's head; (ii) one count of attempted assault in the second degree in violation of N.Y. Penal Law § 120.05(3) for purposely releasing the pit bull on the officers; (iii) one count of assault in the second degree in violation of N.Y. Penal Law § 120.05(3) for injuring Officer Harracksingh during the course of being arrested; and (iv) one count of resisting arrest in violation of N.Y. Penal Law § 205.30 for flailing his arms and refusing to allow NCPD officers to handcuff him. *Id.* at ¶¶ 239-43. In NCPD Form 79SJ Physical Condition Questionnaires, Luckelson also attested that

he was in good health, had no injuries, and did not require medical attention. *Id.* at ¶¶ 245-46; *see also* Reissman Decl. Exs. AN, AO.

On August 31, 2010, the three charges arising under N.Y. Penal § 120.05 were reduced to misdemeanor charges of assault in the third degree in violation of N.Y. Penal Law § 120.00. Defs.' 56.1 Stmt. ¶ 254. On April 18, 2011, those charges were dismissed because the District Court Informations were facially insufficient. *See People v. Frederique*, 31 Misc.3d 1215(A), *4, 927 N.Y.S.2d 818 (Table) (N.Y. Dist. Ct. Apr. 18, 2011). In a February 28, 2011 letter to the Nassau County District Attorney, Johnson wrote that she did not want any charges pressed against Luckelson and requested that all charges concerning her be dropped. Defs.' 56.1 Stmt. ¶ 255; *see also* Reissman Decl. Ex. AS. Ultimately, in August 2012, the final charge pending against Luckelson for resisting arrest was dismissed. Defs.' 56.1 Stmt. ¶ 256. However, it is not clear what role, if any, Johnson's request played in the District Attorney's decision to dismiss Luckelson's resisting arrest charge, as there is no dismissal memorandum or other evidence specifically describing the reason the charge was dropped.

### 4. Johnson's Statements and Recantation

On April 9, 2010, following the incident, Johnson completed and signed a supporting deposition, in which she swore, among other things, that both Stanley and Luckelson punched her in the face, and that Luckelson hit her over the head with a vase, causing a laceration. *See* Reissman Decl. Ex. B. The same night, Johnson gave a second statement to Detective Edward Rogan at the Fifth Precinct, stating that

Stanley "told [Ferrucci], 'move away from the fucking door before I let the dog go.'" *Id.* at Ex. C. On April 30, 2010, Johnson gave a third statement to Detective Sergeant Richard Harasym of the NCPD's Internal Affairs Unit, stating that Luckelson barricaded himself inside the Frederique Home and released a pit bull to attack the officers. *Id.* at Ex. P.

In her February 28, 2011 letter to the Nassau County District Attorney, Johnson recanted her prior statements, claiming "the statements are false and were not written by [her] . . . ." *Id.* at Ex. AS. According to Johnson, her "words were changed and flipped around and tampered with to better justify the police and their wrong doing." *Id.* As described above, she also wrote that she did not want charges pressed against Luckelson. *Id.* Johnson did not, however, specify what portions of her prior statements were purportedly false. *Id.*

### B. <u>Procedural History</u>

By way of a Complaint dated April 8, 2011, Plaintiffs commenced this action against the County of Nassau, the NCPD, and "John Doe" NCPD Officers, alleging causes of action arising under 42 U.S.C. §§ 1981, 1983, 1985, 1986, and New York common law. *See* DE [1]. At a September 20, 2011 initial conference, Judge Feuerstein dismissed Plaintiffs' Complaint without prejudice as unripe because Luckelson's criminal prosecution for resisting arrest was still pending. *See* DE [5]. Following dismissal of Luckelson's resisting arrest charge in state court, this action was reopened on August 6, 2012. *See* DE [9].

On December 13, 2013, Plaintiffs sought leave to file an amended complaint naming as defendants: Police Officers Carbone, Cetto, Harracksingh, McNeill, Rosario, Scholl, and Siar; Sergeants Barricelle and Pizzimenti; Detectives Richard Lee and Edward Rogan; and Ambulance Medical Technician Ferrucci. *See* DE [36]. Defendants opposed the motion on the grounds that the amendments were futile, as the statute of limitations had expired and Plaintiffs were not diligent in timely seeking to amend their Complaint. *See* DE [39]. On May 22, 2014, after Judge Feuerstein So Ordered the parties' consent to proceed before a magistrate judge, Magistrate Judge William D. Wall denied Plaintiffs' motion with respect to proposed defendants Barricelle, Carbone, Cetto, Ferrucci, Harracksingh, Lee, McNeill, Pizzimenti, Rogan, and Siar. *See* DE [43]. Judge Wall held that Plaintiffs were not diligent in seeking to amend their Complaint with respect to those defendants because their identities had been disclosed in Defendants' November 21, 2012 initial disclosures. *Id.* at 4. In contrast, Judge Wall observed that Defendants had not timely disclosed the identities of Officers Scholl and Rosario, and as a result, Plaintiffs could not have sought leave to amend their Complaint as to those individuals before the statute of limitations expired. *Id.* Accordingly, Judge Wall granted Plaintiffs' motion with respect to Officers Scholl and Rosario. *Id.*

Thereafter, on May 30, 2014, Plaintiffs filed an Amended Complaint against the County of Nassau, Police Officer Hector Rosario, and Police Officer Jason Scholl. *See* DE [45]. Plaintiffs allege causes of action arising under: (i) 42 U.S.C. § 1983 for excessive force, unlawful search and seizure, false arrest, malicious prosecution, and

abuse of process; and (ii) New York common law for intentional infliction of emotional distress ("IIED"), false arrest, malicious prosecution, abuse of process, negligence and/or gross negligence, conversion, defamation, and trespass. *Id.* Plaintiffs also assert a cause of action for municipal liability under 42 U.S.C. § 1983 against Nassau County. *Id.*

## II.    LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of establishing that there are no material facts that preclude judgment as a matter of law. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004). In deciding a motion for summary judgment, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986) (holding that a motion for summary judgment should be denied if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the movant has met its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific

facts showing that there is a genuine issue for trial." *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986) (internal quotation omitted); *see also Maxton v. Underwriter Labs., Inc.*, 4 F. Supp. 3d 534, 542 (E.D.N.Y. 2014) ("An issue of fact is considered 'genuine' when a reasonable finder of fact could render a verdict in favor of the non-moving party."). In determining whether summary judgment is warranted, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986); *see also Artis v. Valls*, No. 9:10-CV-427, 2012 WL 4380921, at *6 n.10 (N.D.N.Y. Sept. 25, 2012) ("It is well established that issues of credibility are almost never to be resolved by a court on a motion for summary judgment.").

## III. DISCUSSION

### A. Individual Liability Arising Under 42 U.S.C. § 1983

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983.

Section 1983 itself does not create substantive rights; rather, "it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993); *see also Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) ("[Section 1983] merely provides a method for vindicating

federal rights elsewhere conferred . . . .") (internal quotation omitted).  Therefore, to prevail on a claim arising under Section 1983, a plaintiff must establish:  "(1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law."  *Hawkins v. Nassau County Corr. Facility*, 781 F. Supp. 2d 107, 111 (E.D.N.Y. 2011).  Furthermore, "it is well-settled that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Jones v. Nassau County Sheriff Dep't*, 285 F. Supp. 2d 322, 325 (E.D.N.Y. 2003) (quoting *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)).

Although Plaintiffs' theories of liability arising under Section 1983 are not specifically delineated in the Amended Complaint, the Court interprets the first count of the Amended Complaint to assert causes of action for:  (i) excessive force, (ii) unreasonable search, (iii) unreasonable seizure, (iv) false arrest, (v) malicious prosecution, and (vi) abuse of process.  *See* Am. Compl. ¶¶ 33-53.

### 1. Excessive Force

The Fourth Amendment prohibits the use of excessive force by a police officer. *See Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 1872 (1989)).  In cases of excessive force, "[a] police officer is personally involved [sufficient to establish Section 1983 liability] . . . if the officer either:  (1) directly participates in an assault; or (2) is present during the assault, and fails to intercede on behalf of the victim even though he had a reasonable opportunity to do so."  *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL

1379652, at *25 (S.D.N.Y. Mar. 26, 2015); *see also Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) ("Failure to intercede results in liability where an officer observes excessive force is being used or has reason to know that it will be.").

A police officer's use of force is excessive, thereby violating the Fourth Amendment, "if it is objectively unreasonable 'in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation.'" *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (quoting *Graham*, 490 U.S. at 397, 109 S. Ct. at 1872); *see also Harrell v. County of Nassau*, No. 10-CV-5894, 2013 WL 5439137, at *5 (E.D.N.Y. Sept. 27, 2013) (holding that claims of excessive force that arise during the course of an arrest "must be analyzed under the Fourth Amendment's 'reasonableness' standard rather than under the more generalized 'substantive due process' approach"). Courts must evaluate the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872. Therefore, courts consider the totality of the circumstances, "including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others and whether he is actively resisting arrest." *Sullivan v. Gagnier*, 225 F.3d 161, 165 (2d Cir. 2000); *see also Nimkoff v. Dollhausen*, 751 F. Supp. 2d 455, 463 (E.D.N.Y. 2010) ("In so deciding whether an officer used excessive force, the fact finder must consider the totality of the circumstances, including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest.") (internal quotation omitted).

Courts in the Second Circuit recognize that "some degree of force is necessary when effectuating an arrest . . . ." *Sash v. United States*, 674 F. Supp. 2d 531, 538 (S.D.N.Y. 2009). Nevertheless, "there are limits to the amount of force that may be used, even where the person resists or assaults the officer." *Allison v. Farrell*, No. 97 Civ. 2247, 2002 WL 88380, at *5 (S.D.N.Y. Jan. 22, 2002); *see also Sullivan*, 225 F.3d at 166 ("The force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer."). Therefore, "if there is a dispute concerning the amount of force used and the reasonableness of the force used, the matter becomes a question of fact for a jury to decide." *Allison*, 2002 WL 88380, at *5.

As an initial matter, it is undisputed that neither Scholl nor Rosario interacted with or made contact with Paul or Eline Frederique on April 8, 2010.[3] Defs.' 56.1 Stmt. ¶¶ 257-58. Therefore, the relevant inquiry is whether there is a question of material fact as to whether Officers Scholl and Rosario used excessive force when arresting Stanley and Luckelson, respectively.

### i. Officer Scholl

Plaintiffs identify questions of material fact as to whether the amount of force that Scholl used during the course of Stanley's arrest was reasonable sufficient to defeat summary judgment. Accepting as true Stanley's testimony that he was thrown

---

[3] In the Amended Complaint, Plaintiffs assert each cause of action on behalf of each Plaintiff. *See* Am. Compl. ¶¶ 33-113. In their Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, Plaintiffs clarify that their claim for false arrest is only asserted on behalf of Stanley and Luckelson. *See* Pls.' Opp'n at 18. There is, however, no similar limiting clarification with respect to Plaintiffs' other causes of action, including excessive force, malicious prosecution, and abuse of process.

against a fence and punched in the back, a reasonable jury could find that amount of force to be excessive, particularly in light of the fact that Defendants concede that Stanley was not resisting arrest. *See* Defs.' 56.1 Stmt. ¶ 65; *see also Harrell*, 2013 WL 5439137, at *10 (denying motion for summary judgment because "[w]hether Plaintiff was punched and the officer's motivation for punching Plaintiff are issues to be decided by a jury"). Moreover, even though Stanley indicated on the Form 79SJ Physical Condition Questionnaires that he did not require medical attention, "an injury need not be serious in order to give rise to a constitutional claim" for excessive force. *Ortiz v. Pearson*, 88 F. Supp. 2d 151, 160 (S.D.N.Y. 2000); *see also Robinson v. Via*, 821 F.2d 913, 924 (2d Cir. 1987) ("While [plaintiff] did not seek medical treatment for her injuries, and this fact may ultimately weigh against her in the minds of the jury in assessing whether the force used was excessive, this failure is not fatal to her claim."); *Gomez v. City of New York*, No. 05 Civ. 2147, 2007 WL 5210469, at *7 (S.D.N.Y. May 28, 2007) ("The law does not require that a plaintiff be bleeding or in need of immediate medical attention to maintain a cause of action for excessive force.") (Report and Recommendation), *adopted by*, 2008 WL 3833811 (S.D.N.Y. Aug. 14, 2008).

Defendants argue that Plaintiffs fail to identify an issue of fact because they "cannot identify any individual officer who allegedly pushed or punched Stanley, and certainly not Rosario or Scholl." *See* Defendants' Reply Memorandum of Law in Further Support of Motion for Summary Judgment ("Reply Mem."), DE [57-8], at 12. However, it is undisputed that only Scholl, Carbone, and Cetto were present when

Stanley was patted down, handcuffed, and placed in the back of Carbone's car. *See* Defs.' 56.1 Stmt. ¶¶ 65, 123, 152. Even if Scholl did not personally push or punch Stanley, he was undoubtedly present and in close proximity during the alleged assault. As such, there is a question of fact at least as to whether Scholl had a reasonable opportunity to intercede on Stanley's behalf. *See Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003) ("A plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene."); *see also Douglas v. City of New York*, 595 F. Supp. 2d 333, 345 (S.D.N.Y. 2009) ("Whether an officer . . . can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide."). Accordingly, the Court finds that genuine issues of fact exist with respect to the allegations of excessive force against Officer Scholl.

### ii.     *Officer Rosario*

Plaintiffs also identify questions of material fact as to whether the amount of force that Rosario used during the course of Luckelson's arrest was reasonable sufficient to survive Defendants' motion. Defendants argue that "the evidence conclusively establishes that no excessive force was used by any officer to subdue [Luckelson] and place him in custody, especially in view of the fact that he was kicking, flailing and had locked his arms beneath his body on the floor resisting arrest." *See* Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Defs.' Mem."), DE [57-5], at 21. According to Defendants, Luckelson made no complaints of abuse immediately following his arrest, Ferrucci observed no blood coming from his ears or bruising to his face, and his medical records from

Winthrop Hospital do not indicate that Luckelson suffered injuries to his head or ear. *Id.* at 18-22.

However, according to Luckelson, he did not resist arrest and attempted to comply with the officers' commands. Pls.' 56.1 Stmt. ¶ 316. He further testified that Rosario was "pounding [his] face with his feet," and that he was kicked and punched in his face, head, legs, arms, back, and dislocated shoulder. *Id.* at ¶¶ 318-21. Further, Luckelson testified that he suffered a laceration to his ear and "blood was gushing out like a waterfall" following the incident. *Id.* at ¶¶ 324, 410. Consistent with Luckelson's version of events, his medical records from Winthrop Hospital reveal that doctors applied a peroxide wipe to his ear at the time of his treatment. *See* Reissman Decl. Ex. AM. Moreover, although Luckelson indicated that his dislocated shoulder was attributable to his earlier fight with Johnson, accepting as true his testimony that officers kicked him in the shoulder, a reasonable jury may find that the officers' actions exacerbated his pre-existing injury. *See Rivera v. City of Rochester*, No. 09-CV-6621, 2015 WL 409812, at *6 (W.D.N.Y. Jan. 29, 2015) (denying motion for summary judgment where the plaintiff alleged that a police officer's use of force exacerbated a prior injury). Based on the foregoing, a reasonable jury could find Rosario's use of force to be excessive. *See Davis v. City of New York*, No. 04-CV-3299, 2007 WL 755190, at *13 (E.D.N.Y. Feb. 15, 2007) (holding that questions of fact precluded summary judgment where the plaintiff testified that officers kicked her in the face while she was handcuffed and laying on the ground); *see also Gomez*, 2007 WL 5210469, at *7 (holding that a lack of documented injuries is an issue properly

considered by a jury in determining whether an arresting officer's use of force was excessive). Accordingly, the Court finds that genuine issues of fact exist with respect to the allegations of excessive force against Officer Rosario.

2. <u>Unlawful Search of the Frederique Home</u>

The Fourth Amendment further provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

The Supreme Court has held that, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585, 100 S. Ct. 1371, 1380 (1980). Accordingly, "[t]he Fourth Amendment generally prohibits a warrantless entry into an individual's home." *Callahan v. City of New York*, 90 F. Supp. 3d 60, 69 (E.D.N.Y. 2015); *see also United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995) ("A warrantless search is *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.") (internal quotation omitted). Relevant for purposes of this motion, the Fourth Amendment's warrantless search prohibition does not apply where exigent circumstances exist such that warrantless entry is necessary. *See Mangino v. Inc. Vill. of Patchogue*, 739 F. Supp. 2d 205, 236 (E.D.N.Y. 2010) ("A warrantless search is permissible if exigent circumstances require state officials' immediate entry to the property."). Therefore, "officers may not, absent exigent circumstances or consent, enter a suspect's home to make a warrantless arrest." *Breitbard v. Mitchell*, 390 F.

Supp. 2d 237, 249 (E.D.N.Y. 2005). Although courts consider various factors in determining whether exigent circumstances existed, "[t]he essential question . . . is whether law enforcement agents were confronted by an 'urgent need' to render aid or take action." *Loria v. Gorman*, 306 F.3d 1271, 1284 (2d Cir. 2002).

It is undisputed that Scholl did not enter the Frederique Home at any time, and that Rosario only entered the basement of the home in order to arrest Luckelson. Defs.' 56.1 Stmt. ¶¶ 98, 128. Rosario did not enter other areas of the home, and he did not search any part of the home, including the basement. *Id.* at ¶ 98. Defendants do not argue that Rosario had consent to enter the Frederique Home to arrest Luckelson, but rather, that exigent circumstances necessitated his warrantless entry. *See* Defs.' Mem. at 17. Plaintiffs do not oppose this argument, and therefore fail to identify a question of fact precluding judgment as a matter of law.[4] *See Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition [to a motion for summary judgment] that relevant claims or defenses that are not defended have been abandoned."). Accordingly Defendants' motion for summary judgment is granted with respect to Plaintiffs' claim for unlawful search of the Frederique Home.

---

[4] To the extent Plaintiffs' contention that Luckelson did not release the Frederiques' pit bull is construed as an objection to the existence of exigent circumstances, several NCPD officers and Johnson stated that Plaintiffs threatened to release the dog if the officers did not get away from the Frederique Home. *See* Defs.' 56.1 Stmt. ¶¶ 48, 67, 79, 101, 118, 151; *see also* Reissman Decl. Ex. C. It is undisputed that the dog was subsequently released and began to run directly at several officers before it was shot and killed. *See* Defs.' 56.1 Stmt. ¶¶ 69, 138, 171.

### 3. <u>Unlawful Seizure for the Death of Angel and Property Damage</u>

The Fourth Amendment also prohibits the "[e]xcessive or unnecessary destruction of property in the course of a search . . . ." *Smith v. City of New York*, No. 04 Civ. 3286, 2010 WL 3397683, at *13 (S.D.N.Y. Aug. 27, 2010); *see also Figueroa v. Kroll*, No. 98 Civ. 837, 2004 WL 2924492, at *5 (S.D.N.Y. Dec. 16, 2004) ("[U]nnecessarily destructive behavior may rise to the level of violating the Fourth Amendment."). The unlawful killing of a pet can serve as a "seizure" for purposes of liability under the Fourth Amendment. *See Carroll v. County of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013) ("[T]he unreasonable killing of a companion animal constitutes an unconstitutional 'seizure' of personal property under the Fourth Amendment."); *Van Patten v. City of Binghamton*, 137 F. Supp. 2d 98, 107 (N.D.N.Y. 2001) ("[T]he killing of Plaintiff's dog is a seizure within the meaning of the Fourth Amendment."). However, as with all claims arising under Section 1983, a defendant must be personally involved to be liable for a violation of the Fourth Amendment's unlawful seizure provision. *See Crandall v. David*, 457 F. App'x 56, 58 (2d Cir. 2012) (affirming summary judgment where the defendant had no personal involvement in an unlawful seizure).

Applying these standards, Defendants' motion for summary judgment is granted with respect to Plaintiffs' claim for unlawful seizure. In the Amended Complaint, Plaintiffs allege that Defendants are liable for unlawful seizure for killing their dog and destroying their personal property while searching their home. Am. Compl. ¶¶ 44-47. With respect to the death of Plaintiffs' dog, neither Scholl nor

Rosario personally deprived Plaintiffs of a constitutional right—*i.e.*, unlawfully seizing Plaintiffs' dog by shooting it—as it is undisputed that neither officer fired his gun on April 8, 2010. *See* Reissman Decl. Ex. R. Likewise, it is also undisputed that, while other officers fired their guns at the dog, Scholl was in Carbone's police car with Stanley and Rosario was positioned several houses down the street with Officer Harracksingh. *See* Defs.' 56.1 Stmt. ¶¶ 80-82, 123-24. As such, there is no evidence that either officer had a reasonable opportunity to intervene to prevent the shooting of Plaintiffs' dog but failed to do so. *See Jackson v. City of New York*, 939 F. Supp. 2d 235, 259 (E.D.N.Y. 2013) (finding personal involvement for unlawful seizure where an officer had a realistic opportunity to intervene). Similarly, neither Scholl nor Rosario is personally responsible for any property damaged during the course of searching Plaintiffs' home, as is undisputed that Scholl never entered the Frederique Home and that Rosario did not participate in any alleged search thereof; he only arrested Luckelson. *See* Defs.' 56.1 Stmt. ¶¶ 98, 128. Immediately upon arresting Luckelson, Rosario brought him upstairs and placed him in Rosario's police car. *Id.* at ¶ 88. Therefore, there is also no evidence that Scholl or Rosario had a reasonable opportunity to intervene and prevent property damage during the course of the alleged search of the Frederique Home but failed to do so.

Based on the foregoing, Plaintiffs fail to establish that either Scholl or Rosario was personally involved with the alleged unlawful seizure of Plaintiffs' property, and Defendants are entitled to judgment as a matter of law. Accordingly, Defendants'

motion for summary judgment is granted with respect to Plaintiffs' claim for unlawful seizure.

4. <u>False Arrest</u>

The Fourth Amendment further prohibits unreasonable seizures in the form of arrests without probable cause. *See Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006) ("[A] § 1983 claim for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause."). In analyzing a claim of false arrest under Section 1983, "federal courts look to the law of the state in which the arrest occurred." *Hoyos v. City of New York*, 999 F. Supp. 2d 375, 385 (E.D.N.Y. 2013); *see also Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) ("A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law.") (internal citation omitted).

To prevail on a claim of false arrest under New York law, a plaintiff must establish: "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Jocks v. Tavernier*, 316 F.3d 128, 134-35 (2d Cir. 2003); *see also Carpenter v. City of New York*, 984 F. Supp. 2d 255, 264 (S.D.N.Y. 2013) ("Under New York state law, a claim of false arrest requires a showing that the confinement was not privileged."). The existence of probable cause for an arrest "is a complete defense to an action for false arrest." *Bernard v. United*

*States*, 25 F.3d 98, 102 (2d Cir. 1994); *see also Jenkins v. City of New York*, 478 F.3d 76, 88 (2d Cir. 2007) ("[U]nder both New York and federal law, summary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable."). Moreover, "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly*, 439 F.3d at 154; *see also Davenport v. County of Suffolk*, No. 99-CV-3088, 2007 WL 608125, at *5 (E.D.N.Y. Feb. 23, 2007) ("[P]robable cause as to any charge at the time of arrest is sufficient to defeat a false arrest claim as a matter of law."). Rather, as long as probable cause exists to arrest a suspect for some crime, it is an absolute defense to a claim for false arrest. *See Mesa v. City of New York*, No. 09 Civ. 10464, 2013 WL 31002, at *10 (S.D.N.Y. Jan. 3, 2013) (holding that "the officers need not have possessed probable cause for every charge" to defeat a claim of false arrest).

Here, Plaintiffs concede that probable cause existed to arrest Stanley and Luckelson for the alleged assault or reckless endangerment charges with regard to Johnson. *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pls.' Opp'n"), DE [57-7], at 20 ("[A]rguably, the police would have had probable cause to arrest and prosecute Stanley and Luckelson Frederique for the alleged Assault or Reckless Endangerment charges only with regard to Ms. Johnson."). Indeed, in Johnson's calls to the Nassau County 911 emergency line, Johnson claimed that Stanley and Luckelson punched her in the face, broke a glass

over her head, and tried to hit her daughter. *See* Reissman Decl. Ex. A. Johnson's complaints are sufficient to establish probable cause to arrest Stanley and Luckelson. *See Carthew v. County of Suffolk*, 709 F. Supp. 2d 188, 197 (E.D.N.Y. 2010) (holding that a victim's 911 call established probable cause for an arrest, thereby precluding a claim for false arrest under Section 1983); *see also Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) ("[P]olice officers, when making a probable cause determination, are entitled to rely on the victims' allegations that a crime has been committed."). Johnson's April 9, 2010 supporting deposition is consistent with her 911 calls in that she again claimed that Stanley and Luckelson punched her in the face and that Luckelson broke a vase over her head. *See* Reissman Decl. Ex. B. Although Johnson later recanted the statements in her supporting deposition, she does not dispute the statements made in her 911 call, and Plaintiffs do not question their accuracy or veracity. *Id.* at Ex. AS. Accordingly, it is undisputed that probable cause existed to arrest Stanley and Luckelson.

Nevertheless, Plaintiffs argue that probable cause is only a complete defense to a false arrest claim where it exists for each charge for which the individual was arrested and prosecuted. *See* Pls.' Opp'n at 19-21. However, Plaintiffs' argument conflates their claim for false arrest with their claim of malicious prosecution, and is directly at odds with well-settled principles of law. *See Mesa*, 2013 WL 31002, at \*10; *cf. Rodriguez v. N.Y.C. Police Dep't*, No. 10 Civ. 891, 2011 U.S. Dist. LEXIS 122871, at \*13 (S.D.N.Y. Oct. 24, 2011) ("Unlike the false arrest analysis, however, Defendants [in a malicious prosecution case] must have had probable cause for each

charge for which Plaintiff was prosecuted."). Therefore, because probable cause existed to arrest Stanley and Luckelson, Defendants' motion for summary judgment is granted with respect to Plaintiffs' false arrest claim arising under Section 1983.

### 5. Malicious Prosecution

Claims of malicious prosecution arising under Section 1983 are governed by the same standard applied under state law. *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995). To prevail on a claim of malicious prosecution under New York law, a plaintiff must establish: "(1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453 (1983)). Additionally, to prevail on a claim for malicious prosecution under Section 1983, "there must be a seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth Amendment." *Washington v. County of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) (internal quotation omitted). Here, Plaintiffs are unable to establish that either Scholl or Rosario initiated legal proceedings against Stanley or Luckelson.

To establish that a defendant initiated a proceeding, "it must be shown that the defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 227 (S.D.N.Y. 2006) (quoting *DeFilippo v. County of Nassau*, 183 A.D.2d 695, 696, 583 N.Y.S.2d 330 (2d Dep't 1992)). In malicious prosecution cases against police officers, plaintiffs have demonstrated that officers initiated criminal

proceedings by having the plaintiff arraigned, by filling out complaining and corroborating affidavits, and by signing felony complaints. *See Llerando-Phipps v. City of New York*, 390 F. Supp. 2d 372, 382-83 (S.D.N.Y. 2005). Furthermore,

> [a]lthough there is a presumption that a prosecutor exercises independent judgment in deciding whether to initiate and continue a criminal proceeding, an arresting officer may be held liable for malicious prosecution "when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors," or when she withholds relevant and material information.

*Mitchell*, 434 F. Supp. 2d at 227 (quoting *Brome v. City of New York*, No. 02 Civ. 7184, 2004 WL 502645, at *5 (S.D.N.Y. Mar. 15, 2004)).

Plaintiffs fail to produce sufficient evidence to overcome summary judgment with respect to their claim for malicious prosecution. It is undisputed that neither Scholl nor Rosario signed the Felony Complaints or District Court Informations charging Stanley and Luckelson with crimes. *See* Reissman Decl. Exs. V, W, AG-AJ. Likewise, it is undisputed that neither officer completed corroborating affidavits that were relied upon in initiating criminal proceedings. *Id.* Moreover, neither Scholl nor Rosario is identified in the NCPD arrest reports as the arresting or booking officer for either arrest. *See id.* at Exs. U, AF. As such, Plaintiffs fail to identify any evidence that Scholl or Rosario played any role, let alone an "active role," in prosecuting Stanley and Luckelson. *Mitchell*, 434 F. Supp. 2d at 227. Therefore, Plaintiffs' claim for malicious prosecution fails as a matter of law. Accordingly, Defendants' motion for summary judgment is granted with respect to Plaintiffs' cause of action for malicious prosecution arising under Section 1983.

6. Abuse of Process

A claim for abuse of process under Section 1983 is analyzed under the same standards applicable under New York law. *Anderson v. County of Nassau*, 297 F. Supp. 2d 540, 548 (E.D.N.Y. 2004). To prevail on a claim for abuse of process under New York law, a plaintiff must establish that the defendant: "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Bertuglia v. City of New York*, --- F. Supp. 3d ---, 2015 WL 5692159, at *21 (S.D.N.Y. Sept. 28, 2015) (quoting *Savino*, 331 F.3d at 76). Moreover, "[t]he pursuit of a collateral objective must occur after the process is issued; the mere act of issuing process does not give rise to a claim." *Lopez v. City of New York*, 901 F. Supp. 684, 691 (S.D.N.Y. 1995).

Plaintiffs fail to raise a question of material fact with respect to their claim for abuse of process. As previously discussed, it is undisputed that neither Scholl nor Rosario commenced legal proceedings against Stanley or Luckelson, and Plaintiffs do not identify any other form of regularly issued process that Scholl or Rosario employed, as required to establish a claim for abuse of process. *See Bertuglia*, 2015 WL 5692159, at *21. Therefore, Defendants' motion for summary judgment is granted with respect to Plaintiffs' abuse of process claim arising under Section 1983.

## B. <u>Qualified Immunity</u>

Defendants argue that Scholl and Rosario are entitled to qualified immunity with respect to Plaintiffs' false arrest and malicious prosecution claims, and that Rosario is entitled to qualified immunity with respect to Plaintiffs' excessive force claim. *See* Defs.' Mem. at 25-30. As an initial matter, having concluded that Defendants are entitled to summary judgment on the merits of Plaintiffs' false arrest and malicious prosecution claims, the Court need not determine whether Scholl and Rosario are entitled to qualified immunity with respect to those causes of action. *See Toliver v. City of New York*, No. 10 Civ. 5803, 2012 WL 6013098, at *8 (S.D.N.Y. Dec. 3, 2012) ("Because summary judgment is granted to the Supervisory Defendants, the Court need not determine whether those defendants would be entitled to qualified immunity."). Therefore, the Court considers only whether Rosario is entitled to qualified immunity with respect to Plaintiffs' excessive force claim.

The doctrine of qualified immunity "protects government officials from suit if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (internal quotation omitted). A police officer is entitled to qualified immunity if he establishes "either that his conduct did not violate 'clearly established rights' of which a reasonable person would have known, or that it was 'objectively reasonable' to believe that his acts did not violate these clearly established rights." *Landy v. Irizarry*, 884 F. Supp. 788, 800 (S.D.N.Y. 1995) (quoting *Finnegan v. Fountain*, 915 F.2d 817, 818 (2d Cir. 1990)). In determining whether the doctrine

of qualified immunity applies, courts consider: "(1) whether a plaintiff has shown facts making out a violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the officer to believe the conduct was lawful." *Deanda v. Hicks*, --- F. Supp. 3d ---, 2015 WL 5730345, at \*12 (S.D.N.Y. Sept. 30, 2015) (quoting *Gonzalez*, 728 F.3d at 154). Relevant for purposes of this action, "it is axiomatic that the right that plaintiff asserts—namely plaintiff's right under the Fourth Amendment to be free from excessive force—is clearly established." *Hodge v. Vill. of Southampton*, 838 F. Supp. 2d 67, 86 (E.D.N.Y. 2012). Therefore, the relevant inquiry is whether it was objectively reasonable for Rosario to believe that his actions did not violate Luckelson's constitutional rights.

An officer's actions are objectively reasonable "if officers of reasonable competence could disagree on the legality of the defendant's actions." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 206 (2d Cir. 2000). However, courts have observed that the distinction between the defense of qualified immunity and the substantive law of an excessive force claim has become blurred. *See, e.g.*, *Landy*, 884 F. Supp. at 800 ("The practical difference between the objective reasonableness required to defend on the merits of an excessive force claim and that required for a qualified immunity defense is difficult to decipher."); *Merzon v. County of Suffolk*, 767 F. Supp. 432, 447 (E.D.N.Y. 1991) (observing that the objective reasonableness determination of a Fourth Amendment excessive force claim may merge with the question of whether a claim is subject to qualified immunity). Therefore, summary

judgment on qualified immunity grounds is inappropriate where genuine issues of fact preclude a finding that an officer's actions were objectively reasonable. *See Hodge*, 838 F. Supp. 2d at 85-86.

Here, as discussed above, there are questions of material fact as to whether Rosario's use of force during the course of Luckelson's arrest was objectively reasonable. Those questions of fact preclude summary judgment on qualified immunity grounds. *See Smith v. Fields*, No. 95 Civ. 8374, 2002 U.S. Dist. LEXIS 3529, at *22 n.9 (S.D.N.Y. Mar. 1, 2002) (holding that allegations that the plaintiff was "slapped and kicked about the face" were sufficient to defeat a claim of qualified immunity at the summary judgment stage); *Nogue v. City of New York*, No. 98 Civ. 3058, 1999 U.S. Dist. LEXIS 13201, at *31 (E.D.N.Y. Aug. 27, 1999) (holding that, where the plaintiff alleged that an officer kicked and punched him while he was on the ground, the issue of qualified immunity was for a jury). Therefore, Defendants' motion for summary judgment on qualified immunity grounds with respect to Plaintiffs' excessive force claim against Rosario is denied.[5]

## C. Municipal Liability Arising Under 42 U.S.C. § 1983

A municipality may not be held liable under Section 1983 on a *respondeat superior* theory of liability. *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 2036 (1978); *see also Genovese v. Town of Southampton*, 921 F.

---

[5] Defendants only argue that Officer Rosario is entitled to qualified immunity with respect to Plaintiffs' excessive force claim. *See* Defs.' Mem. at 28-30. However, even if they advanced the same argument on behalf of Officer Scholl, questions of material fact preclude summary judgment on qualified immunity grounds because, as discussed herein, there are questions of material fact as to whether the amount of force he used during the course of Stanley's arrest was objectively reasonable. *See Smith*, 2002 U.S. Dist. LEXIS 3529, at *22 n.9.

Supp. 2d 8, 24 (E.D.N.Y. 2013) ("[A] municipal entity may only be held liable where the entity itself commits a wrong; a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.") (internal quotation omitted). A municipality may only be found liable under Section 1983 "if the deprivation of the plaintiff's rights under federal law [was] caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *see also Pipitone v. City of New York*, 57 F. Supp. 3d 173, 194 (E.D.N.Y. 2014) ("Municipalities can only be held liable under § 1983 when they are a 'moving force' behind the constitutional deprivation."); *DeJesus v. Vill. of Pelham Manor*, 282 F. Supp. 2d 162, 175 (S.D.N.Y. 2003) (holding that a plaintiff "must demonstrate a causal connection between the policy at issue and the unconstitutional acts committed by the municipality's agent"). A policy or custom for purposes of municipal liability under Section 1983 need not be explicit. *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992). Rather, a policy or custom may be inferred by constitutional violations that are so "persistent and widespread" that they "practically have force of law." *Davis v. City of New York*, 959 F. Supp. 2d 324, 338 (S.D.N.Y. 2013). "However, 'a single incident involving an employee below the policymaking level will not suffice to support an inference of municipal custom or policy.'" *Brewster v. Nassau County*, 349 F. Supp. 2d 540, 549 (E.D.N.Y. 2004) (quoting *Vann v. City of New York*, 72 F.3d 1040, 1050 (2d Cir. 1995)).

A municipality may also be held liable where it demonstrates a "manifest failure to train, supervise or discipline [its] employees." *Mahan v. City of New York*,

No. 00-CV-6645, 2005 WL 1677524, at *3 (E.D.N.Y. July 19, 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S. Ct. 2427, 2436 (1985)).  In such cases, an inference of a municipal custom or policy may

> be drawn from circumstantial proof, such as evidence that the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction, or evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges that its agents were violating citizens' constitutional rights.

*DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998); *see also Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("We have held that municipal inaction such as the persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy or ratification of unconstitutional conduct within the meaning of *Monell*.").  However, "[o]nly where a failure . . . reflects a deliberate or conscious choice by a municipality . . . can a city be liable for such a failure under § 1983."  *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S. Ct. 1197, 1205 (1989); *see also Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 538 (S.D.N.Y. 2012) ("A municipality may be liable for the failure to supervise or discipline its employees only where the need to act is so obvious, and the inadequacy of the current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need.") (internal quotation omitted).

Applying these standards, Plaintiffs are unable to establish a question of material fact as to municipal liability arising under Section 1983.  According to Plaintiffs, "[t]he severity of the incident, the failure to investigate, retrain, or

discipline, and the Chief's approval of the incident provide sufficient indication of a failure to supervise such that summary judgment on this issue would be premature." Pls.' Opp'n at 35. Specifically, Plaintiffs argue that: (i) the NCPD failed to adequately investigate and discipline its officers following Plaintiffs' complaints regarding the April 8, 2010 incident; and (ii) the April 19, 2010 Firearm Discharge Report establishes that NCPD policymakers endorsed the officers' actions such that a municipal policy or custom may be inferred. *Id.* at 34-35. Neither argument is sufficient to defeat Defendants' motion for summary judgment.

Initially, although Plaintiffs argue that they "complained to the Nassau County Police Department about its officers' actions against their dog Angel, wherein Plaintiffs' dog was brutally killed, [and] Plaintiffs' home was shot-up and riddled with bullets," *see id.* at 34, a "Plaintiff cannot infer a policy from the alleged violation of his own civil rights." *Anderson v. City of New York*, 657 F. Supp. 1571, 1574 (S.D.N.Y. 1987). Rather, because Plaintiffs allege that non-policymaking police officers deprived them of their constitutional rights, they must establish that the possibility of such a deprivation "was so 'highly predictable' that it reflected a conscious disregard on the part of the municipality to this deprivation." *Lundina v. City of New York*, No. 95-CV-4409, 1998 WL 846813, at *3 (E.D.N.Y. Oct. 5, 1998) (quoting *Bd. of the Cty. Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409 117 S. Ct. 1382, 1391 (1997)). Plaintiffs fail to identify any evidence suggesting that it would be "highly predictable" that NCPD officers would deprive them of their constitutional rights. To that end, they do not identify any prior instances in which the NCPD failed to

discipline its officers or investigate complaints of misconduct such that the officers would be "emboldened" to engage in future misconduct. *See Pipitone*, 57 F. Supp. 3d at 196 ("It is plainly foreseeable that the failure to discipline an officer who has been caught red-handed might embolden that officer's associates and colleagues to engage in similar misconduct."). Accordingly, Plaintiffs fail to identify a question of material fact as to whether the NCPD's purported failure to train, supervise, and discipline its officers amounted to deliberate indifference.

Next, relying on the Firearm Discharge Report, Plaintiffs argue that NCPD "policymakers endorsed and concurred that the officers were justified in using the force that was used and that the first round [of gunshots] as well as the last expended was necessary and reasonable." Pls.' Opp'n at 35 (internal quotation marks omitted). However, the Firearm Discharge Report was drafted after the April 8, 2010 incident, and it is well-established that "conduct occurring after the incident at issue lacks the requisite 'affirmative link' to plaintiffs' injuries—that is, plaintiffs cannot establish causation." *Sango v. City of New York*, No. 83-CV-5177, 1989 WL 86995, at *15 n.2 (E.D.N.Y. July 25, 1989); *see also Pitt v. City of New York*, No. 82 Civ. 3349, 1984 WL 1323, at *3 (S.D.N.Y. Dec. 10, 1984) ("This one isolated incident of alleged assaultive behavior, and action taken by the City in response to that incident does not alone give rise to an inference that the City tacitly encourages such acts of violence."). Plaintiffs fail to identify any acts of misconduct prior to the April 8, 2010 incident from which an "affirmative link to Plaintiffs' injuries" could be inferred. *Sango*, 1989 WL 86995, at *15 n.2. Indeed, other courts have rejected similar "ratification" theories of

liability. *See, e.g.*, *Turpin v. Mailet*, 619 F.2d 196, 202 (2d Cir. 1980) (holding that the plaintiff failed to establish a municipal policy or custom where "[t]here was no evidence of a prior pattern or practice . . . on the part of the police force, much less that it had been brought to the attention of the Board [of Police Commissioners]"). Therefore, absent evidence of prior misconduct by NCPD officers, the Firearm Discharge Report is insufficient to create an inference that a municipal policy or custom resulted in an alleged deprivation of Plaintiffs' constitutional rights.

Finally, relying on *Michael v. County of Nassau*, No. 09-CV-5200, 2010 WL 3237143 (E.D.N.Y. Aug. 11, 2010), Plaintiffs argue that a single incident of misconduct by a non-policymaking individual can suffice to establish liability. *See* Pls.' Opp'n at 34. This argument also fails. In *Michael*, the court denied the defendant's motion to dismiss, holding that, "the fact that so much of [the alleged misconduct] happened at headquarters, including in a public hallway, suggests that the officers involved did not fear supervisory personnel observing their conduct, intervening to stop them, or subjecting them to disciplinary action for their misdeeds." 2010 WL 3237143, at *5. The court held that the plaintiff's allegations sufficed "*at [the pleading] stage*—to create the plausible inference that Nassau County had an informal policy or custom of at least tolerating police misconduct." *Id.* (emphasis added). In contrast, as discussed above, Plaintiffs fail to identify other instances in which the NCPD's actions suggested an informal policy or custom of at least tolerating police misconduct. Accordingly, Plaintiffs' reliance on *Michael* is misplaced, as it does not conflict with the well-settled principal that "a single incident

involving an employee below the policymaking level will not suffice to support an inference of municipal custom or policy." *Vann*, 72 F.3d at 1050.

Based on the foregoing, Plaintiffs fail to identify a question of material fact as to whether a municipal policy or custom caused a deprivation of their constitutional rights. Therefore, Defendants' motion for summary judgment is granted with respect to Plaintiffs' claim against Nassau County arising under Section 1983.

### D. State Law Claims

In addition to their claims arising under Section 1983, Plaintiffs assert claims arising under New York state law for IIED, negligence/gross negligence, conversion, trespass, defamation, false arrest, malicious prosecution, and abuse of process. *See* Am. Compl. ¶¶ 66-113. As an initial matter, the Court notes that, unlike claims arising under Section 1983, a municipality may be vicariously liable for the common law torts of its employees. *See L.B. v. Town of Chester*, 232 F. Supp. 2d 227, 239 (S.D.N.Y. 2002) ("Unlike cases brought under [Section] 1983, municipalities may be liable for the common law torts, like false arrest and malicious prosecution, committed by their employees under the doctrine of *respondeat superior*."). Therefore, the Court considers whether issues of fact exist with respect to Plaintiffs' state law claims against Officers Scholl and Rosario, as well as whether Nassau County may be held vicariously liable for the actions of the non-defendant police officers.[6]

---

[6] Even where a court determines that no individual defendant is liable to the plaintiff, a municipality may still be vicariously liable for the tortious actions of its non-defendant employees. *See Merriweather v. City of New York*, No. 12 Civ. 5258, 2015 WL 57399, at *3 (S.D.N.Y. Jan. 5, 2015)

1. Intentional Infliction of Emotional Distress

To prevail on a claim for IIED, a plaintiff must establish: (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (citing *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350 (1993)). The alleged extreme or outrageous conduct must "go beyond all possible bounds of decency and be atrocious, and utterly intolerable in a civilized community." *Greenaway v. County of Nassau*, 97 F. Supp. 3d 225, 240 (E.D.N.Y. 2015) (internal quotation omitted). However, "a claim for IIED may not be sustainable where the conduct complained of falls well within the ambit of other tort liability." *Turley v. ISG Lackawanna Inc.*, 774 F.3d 140, 157 (2d Cir. 2014); *see also Moore v. City of New York*, 219 F. Supp. 2d 335, 339 ("In New York, intentional infliction of emotional distress is a theory of recovery that is to be invoked only as a last resort, when traditional tort remedies are unavailable.") (internal quotation omitted). Therefore, "IIED claims that are duplicative of other tort claims should . . . be dismissed." *McGrath v. Nassau Health Care Corp.*, 217 F. Supp. 2d 319, 335 (E.D.N.Y. 2002).

(holding that, upon dismissal of the only individual defendant, "Plaintiff's only remaining claims as to the City are a federal claim for a violation of his constitutional rights by a municipal policy and his state law claims").

### i. Officers Scholl and Rosario

Plaintiffs fail to identify a question of material fact with respect to their IIED claim against Officers Scholl and Rosario. First, insofar as Plaintiffs' IIED claim is asserted on behalf of Stanley and Luckelson, it fails as a matter of law because it overlaps with traditional tort theories of liability, including their surviving claim for excessive force. *See Russo v. County of Warren*, No. 12-CV-1616, 2015 WL 7738043, at *10 (N.D.N.Y. Dec. 1, 2015) ("Plaintiff may not properly bring her IIED claims in addition to her excessive force and assault and battery claims."). Moreover, to the extent that Plaintiffs' IIED claim is asserted on behalf of Paul and Eline, and is premised on the death of their dog, *see* Am. Compl. ¶¶ 67-70, as discussed above, neither Scholl nor Rosario fired his gun, and therefore neither could have killed Angel. *See* Reissman Decl. Ex. R. Plaintiffs fail to present any evidence that Scholl or Rosario acted in a manner towards Paul and Eline that is "utterly intolerable in a civilized society." *Greenaway*, 97 F. Supp. 3d at 240. Accordingly, Plaintiffs' IIED claim against Officers Scholl and Rosario fails as a matter of law.

### ii. Nassau County

Plaintiffs also fail to identify a question of material fact with respect to their IIED claim against Nassau County. Pursuant to New York law, "[p]ublic policy bars claims for intentional infliction of emotional distress against a governmental entity." *Burbar v. Inc. Vill. of Garden City*, 961 F. Supp. 2d 462, 474 (E.D.N.Y. 2013) (quoting *Rodgers v. City of New York*, 106 A.D.3d 1068, 1070, 966 N.Y.S.2d 466 (2d Dep't 2013)); *see also Dzwonczyk v. Syracuse City Police Dep't*, 710 F. Supp. 2d 248, 273 n.6

(N.D.N.Y. 2008) ("Plaintiff's IIED claim against the County must fail, as it is well-settled that public policy bars claims sounding in intentional infliction of emotional distress against a government entity.") (internal quotation omitted). Therefore, Plaintiffs are unable to establish a cause of action for IIED against Nassau County.

Based on the foregoing, Defendants' motion for summary judgment is granted with respect to Plaintiffs' IIED claim.

### 2. Negligence/Gross Negligence and Vicarious Liability

To prevail on a claim for negligence under New York law, a plaintiff must establish "(1) the existence of a duty on the defendant's part as to the plaintiff; (2) a breach of that duty; and (3) resultant injury to the plaintiff." *Field Day, LLC v. County of Suffolk*, No. 04-CV-2202, 2005 WL 2445794, at *23 (E.D.N.Y. Sept. 30, 2005). However, "[u]nder New York law, harm predicated on an intentional act may not give rise to a claim of negligence." *Bah v. City of New York*, No. 13 Civ. 6690, 2014 WL 1760063, at *13 (S.D.N.Y. May 1, 2014); *see also Dineen v. Stramka*, 228 F. Supp. 2d 447, 454 (S.D.N.Y. 2002) ("When a plaintiff asserts excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie.").

### i.    *Officers Scholl and Rosario*

Plaintiffs are unable to defeat summary judgment with respect to their negligence claim against Officers Scholl and Rosario. According to Plaintiffs, Officer Scholl punched Stanley in the back during the course of arresting him, and Officer Rosario kicked Luckelson in the face and head while attempting to handcuff and

arrest him.  *See* Pls.' 56.1 Stmt. ¶¶ 286, 318-19.  Accepting Plaintiffs' allegations as true, there is "no basis in the record to support a finding that the [contact] was inadvertent, accidental, or anything but willful."  *Sanchez by Hernandez v. Wallkill Cent. Sch. Dist.*, 221 A.D.2d 857, 857, 633 N.Y.S.2d 871 (3d Dep't 1995).  Therefore, Plaintiffs' claim for negligence against Officers Scholl and Rosario fails as a matter of law.  *See Dewitt v. Home Depot U.S.A., Inc.*, No 10-CV-3319, 2012 WL 4049805, at *11 (E.D.N.Y. Sept. 12, 2012) (granting summary judgment on the plaintiff's negligence claim where the defendant's "offensive bodily contact with the plaintiff— if it occurred at all—was intentional and not negligent").

> ii. *Nassau County*

Plaintiffs' negligence claim against Nassau County similarly fails as a matter of law.  Plaintiffs allege that:

> The COUNTY Defendant had a [*sic*] duties under 42 U.S.C. § 1983 [as] well as under the Fourth, Fifth, Eighth and Fourteenth Amendments, and under New York State Law and their own rules and regulations, to prevent and cease the wrongful detainment, false arrest, false imprisonment, malicious and false charging and prosecuting, as well as a duty to investigate, supervise and discipline DEFENDANT OFFICERS and prevent other wrongful acts that were committed against Plaintiffs.

Am. Compl. ¶ 90.

However, as discussed above, a municipality may not be held vicariously liable under Section 1983 for its employees' actions.  *Monell*, 436 U.S. at 690-91, 98 S. Ct. at 2036.  Moreover, "[u]nder New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution."  *Bernard*,

25 F.3d at 102; *see also Ellis v. Gannon*, No. 10-CV-1373, 2011 WL 5513184, at *6 (E.D.N.Y. Nov. 10, 2011) ("For claims seeking damages based upon a purportedly unlawful arrest and prosecution, a plaintiff must resort to the traditional remedies of false imprisonment and malicious prosecution and cannot recover under the broader principles of negligence."); *Rheingold v. Harrison Town Police Dep't*, 568 F. Supp. 2d 384, 395 n.3 (S.D.N.Y. 2008) ("To the extent that plaintiff is alleging an alternate theory of liability for false arrest, imprisonment and prosecution sounding in negligence, New York does not provide a cause of action under such a theory."). Therefore, Plaintiffs' claim for vicarious liability against Nassau County for the purported negligence of the non-defendant police officers fails as a matter of law.

Based on the foregoing, Defendants' motion for summary judgment is granted with respect to Plaintiffs' cause of action for negligence/gross negligence and vicarious liability.

### 3. Conversion

Under New York law, "conversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property." *E. Coast Novelty, Inc. v. City of New York*, 781 F. Supp. 999, 1011-12 (S.D.N.Y. 1992); *see also Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 406 (2d Cir. 2006) ("Conversion is the unauthorized assumption and exercise of the right of ownership of goods belonging to another to the exclusion of the owner's rights."). To prevail on a cause of action for conversion, "a plaintiff must show (1) a possessory right or

interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Anghel v. New York State Dep't of Health*, 947 F. Supp. 2d 284, 303 (E.D.N.Y. 2013) (internal quotation omitted). "Some affirmative act . . . has always been an element of conversion." *Id.* (quoting *State v. Seventh Regiment Fund, Inc.*, 98 N.Y.2d 249, 260, 746 N.Y.S.2d 637 (2002)). Here, Plaintiffs premise their state law conversion claim on the death of their dog. *See* Am. Compl. ¶¶ 95-98.

### i.    *Officers Scholl and Rosario*

Plaintiffs fail to identify a question of material fact with respect to their conversion claim against Officers Scholl and Rosario. As discussed above, it is undisputed that neither Scholl nor Rosario fired his gun on April 8, 2010. *See* Reissman Decl. Ex. R. Therefore, Plaintiffs are unable to establish that Scholl or Rosario interfered with their possessory rights by killing their dog, and their cause of action for conversion against Officers Scholl and Rosario fails as a matter of law.

### ii.    *Nassau County*

Plaintiffs also fail to identify a question of material fact with respect to their conversion claim against Nassau County. Courts in the Second Circuit recognize that the shooting of a dog is "a severe intrusion given the emotional attachment between a dog and its owner." *Carroll*, 712 F.3d at 651. However, "at least in some circumstances, it is reasonable for an officer to shoot a dog that he believes poses a threat to his safety or the safety of the community." *Id.*; *see also Dziekan v. Gaynor*, 376 F. Supp. 2d 267, 273 (D. Conn. 2005) ("[C]ourts have generally held that no

unreasonable seizure may be found where an officer has killed a dog that posed an imminent threat."). In contrast, it is generally unreasonable to shoot a dog that does not pose an imminent threat of harm. *See, e.g.*, *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210-11 (3d Cir. 2001) (holding that a dog did not pose an imminent threat where it was unleashed, but stationary in a parking lot); *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir. 1994) (holding that a dog did not pose an imminent threat where it was standing still in its owner's yard). Ultimately, the relevant inquiry is whether the officer who killed the dog acted "unreasonably under the totality of the circumstances." *Carroll*, 712 F.3d at 651.

Here, the undisputed evidence establishes that the officers who shot Plaintiffs' dog acted reasonably under the circumstances. First, it is undisputed that the dog came out of the Frederique Home and began running toward Officer Carbone. *See* Pls.' 56.1 Stmt. ¶¶ 139, 171. Although Luckelson testified that the dog "walked out" of the open door, *see id.* at ¶ 308, Plaintiffs appear to abandon that contention, acknowledging elsewhere that the dog ran at the officers. *See id.* at ¶¶ 171-72. Moreover, although Plaintiffs dispute the characterization that the dog "charged" at the officers, *see id.* at ¶ 139, they actually concede that "the dog started charging back up the driveway where Pizzimenti was with another officer." *Id.* at ¶ 172. In any event, the record evidence Plaintiffs cite does not support their dispute, and multiple witnesses testified that the dog ran directly at the officers. *See* Defs.' 56.1 Stmt. ¶¶ 69, 138-40, 171, 199. To that end, Carbone testified that the dog charged at him "hard and fast," that it looked aggressive and vicious, and that he believed that his life was

in danger. *See* Calliste Decl. Ex. E at 121:21-122:24. After Carbone fired his gun at the dog, it changed course, and began to run directly at Sergeant Pizzimenti and Officers McNeill and Siar. *See* Defs.' 56.1 Stmt. ¶¶ 139-40, 171, 199. Siar testified that the dog was barking as it charged at the officers. *Id.* at ¶ 171. In the Firearm Discharge Report, Deputy Inspector Robert Bressingham concluded that, "under the circumstances presented, Sgt. Pizzimenti, P.O. Carbone, P.O. Siar and P.O. McNeill were justified in using that force which was used at this incident. As long as the imminent threat from the pit bull continued to jeopardize the safety of the officers, the first round [of gunshots] as well as the last round expended was necessary and reasonable." Reissman Decl. Ex. R. These facts, which Plaintiffs' opposition papers corroborate, are sufficient to establish that the officers who shot at the Frederiques' dog reasonably perceived a threat to their own safety, and to the safety of others. *See Powell v. Johnson*, 855 F. Supp. 2d 871, 876 (D. Minn. 2012) ("[I]t was not unreasonable for [the defendant] to perceive a threat to his safety from a large, unleashed pit bull 'jogging' up behind him with its teeth bared."); *Chambers v. Doe*, 453 F. Supp. 2d 858, 868 (D. Del. 2006) (granting motion for summary judgment where an officer shot a pit bull that "was growling, aggressive, and advancing towards [the officer], who was attempting to arrest plaintiff"); *Dziekan*, 376 F. Supp. 2d at 273 (holding that a police officer acted reasonably when he shot an unleashed fifty- to sixty-pound dog that was running toward him).

Although Plaintiffs do not specifically oppose Defendants' motion with respect to their conversion claim, they argue, among other things, that NCPD officers made

no effort to secure the dog, denied the Frederiques' requests to enter the home in order to secure the dog, and failed to call the Emergency Services Unit ("ESU"), which is trained to deal with dogs. *See* Pls.' Opp'n at 34-35. Although "the failure to plan adequately for the presence of dogs during a search" may be unreasonable, there is no evidence that the non-defendant officers unreasonably failed to plan for the presence of a dog in responding to the incident at the Frederique Home. *See Carroll*, 712 F.3d at 652. Rather, and notwithstanding Plaintiffs' argument that "ESU was not on the scene when the dog was released," *see* Pls.' 56.1 Stmt. ¶ 437, Pizzimenti testified, without contradiction in the record, that he called ESU to provide assistance. *See* Calliste Decl. Ex. K at 48:6-21. Officer Cetto testified that ESU eventually arrived on scene. *Id.* at Ex. G at 135:4-9. The fact that the circumstances warranted action prior to ESU's arrival does not support an inference that the NCPD officers failed to adequately plan for the presence of a dog. Therefore, Plaintiffs fail to establish that NCPD officers acted unreasonably under the circumstances.

Based on the foregoing, Defendants' motion for summary judgment is granted with respect to Plaintiffs' conversion claim.

### 4. Defamation

Under New York law, "spoken defamatory words are slander; written defamatory words are libel." *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001); *see also Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000) ("Libel is a method of defamation expressed in writing or print."). To prevail on a claim for libel under New York law, a plaintiff must establish: "(1) a written defamatory

statement of fact regarding the plaintiff; (2) published to a third party by the defendant; (3) [the] defendant's fault; (4) the falsity of the defamatory statement; and (5) injury to [the] plaintiff." *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001); *see also Macineirghe v. County of Suffolk*, No. 13-CV-1512, 2015 WL 4459456, at *9 (E.D.N.Y. July 21, 2015). A written statement is defamatory "if it tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community, even though it may impute no moral turpitude to him." *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 400 (S.D.N.Y. 1998). Whether a particular statement is defamatory is a matter of law to be determined by the court in the first instance. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265, 84 S. Ct. 710, 718 (1964); *see also Mitre Sports Int'l Ltd. v. HBO, Inc.*, 22 F. Supp. 3d 240, 252 (S.D.N.Y. 2014). According to Plaintiffs, Defendants "intentionally published a defamatory statement by filing criminal charges against Plaintiff for the purpose of injuring Plaintiff and making statements to the Press and Media Outlets." Am. Compl. ¶ 104. Plaintiffs further argue that "there is no doubt that Defendant Rosario filed a false report accusing the plaintiff [Luckelson Frederique] of a serious crime." Pls.' Opp'n at 30 (internal quotation omitted).

### i. Officers Scholl and Rosario

Plaintiffs are unable to establish an issue of material fact with respect to their defamation claim against Officers Scholl and Rosario. As an initial matter, there is no evidence that any NCPD officer, including Scholl and Rosario, made any

statements—written or oral—to the "Press and Media Outlets." Am. Compl. ¶ 104. Likewise, to the extent that Plaintiffs' defamation claim rests on purportedly defamatory statements in the instruments charging Stanley and Luckelson with crimes, it is undisputed that neither Scholl nor Rosario drafted, signed, or otherwise approved the Felony Complaints or District Court Informations. *See* Reissman Decl. Exs. V, W, AG-AJ. Therefore, because neither Scholl nor Rosario personally published the criminal charges against Stanley and Luckelson to a third party, they cannot be liable for any allegedly defamatory statements contained therein. *See Croton Watch Co., Inc. v. Nat'l Jeweler Magazine, Inc.*, No. 06-CV-662, 2006 WL 2254818, at *3 (S.D.N.Y. Aug. 7, 2006) ("A defendant cannot be held liable for defamation where it did not make or publish the statement at issue.").

Next, to the extent that Plaintiffs' defamation claim is premised on Rosario's June 16, 2010 report, it is well-established that a statement is generally "subject to a qualified privilege when it is fairly made by a person in the discharge of some public or private duty, legal or moral." *Chandok v. Klessig*, 632 F.3d 803, 814 (2d Cir. 2011) (quoting *Rosenberg v. MetLife, Inc.*, 8 N.Y.3d 359, 365, 834 N.Y.S.2d 494 (2007)). Qualified privilege exists where communications are: "(1) made by an individual who has an interest in the subject, or a moral or societal duty to speak; and (2) sent to a person who has a corresponding interest or duty." *Nicholas v. City of Binghamton*, No. 10-CV-1565, 2012 WL 3261409, at *19 (N.D.N.Y. Aug. 8, 2012). To overcome a qualified privilege defense, the plaintiff must establish that the defendant "acted

beyond the scope of the privilege, with common law malice, or with knowledge that the statement was false or with reckless disregard as to its truth." *Id.*

Here, the June 16, 2010 report is addressed to the commanding officer of the NCPD Internal Affairs Unit, is labeled as an "internal correspondence," and was drafted for administrative purposes only. *See* Calliste Decl. Ex. W. It is beyond dispute that Rosario and the commanding officer of the NCPD Internal Affairs Unit have corresponding interests and duties with respect to the events of April 8, 2010 and Luckelson's subsequent criminal prosecution. Moreover, there is no evidence that the statements contained in the June 16, 2010 report were made with malice or reckless disregard such that they would not be protected by qualified immunity.[7] Therefore, Rosario is protected by the qualified privilege with respect to the statements contained in the June 16, 2010 internal report, and Plaintiffs' claim for defamation fails as a matter of law.

### ii. Nassau County

Plaintiffs' defamation claim against Nassau County is likewise untenable. Pursuant to New York law, "individuals participating in a public function such as judicial proceedings are afforded protection from liability by an absolute immunity." *Remley v. State*, 174 Misc.2d 523, 534-35, 665 N.Y.S.2d 1005 (N.Y. Ct. Cl. 1997). "A

---

[7] The Court further notes that, although Plaintiffs argue that the June 16, 2010 report accuses Luckelson of committing a "serious crime," *see* Pls.' Opp'n at 30, the only crime identified therein is that of resisting arrest. *See* Calliste Decl. Ex. W. Under New York law, resisting arrest is a misdemeanor, and therefore not a serious crime for purposes of defamation *per se*. *See Ferlito v. County of Suffolk*, No 06-CV-5708, 2007 WL 4180670, at *5 (E.D.N.Y. Nov. 19, 2007) (holding that "resisting arrest is a misdemeanor and do[es] not constitute slander *per se*"); *see also Lieberman v. Gelstein*, 80 N.Y.2d 429, 436, 590 N.Y.S.2d 857 (1992) ("Not every imputation of unlawful behavior is slanderous per se."). Therefore, even if Rosario was not protected by qualified immunity, Plaintiffs still fail to establish that the June 16, 2010 report is defamatory *per se*.

criminal prosecution is a judicial proceeding and the complaint is the instrument which commences the action." *Id.*; *see also* N.Y. C.P.L.R. § 1.20 ("'Felony complaint' means a verified written accusation by a person . . . filed with a local criminal court, which charges one or more defendants with the commission of one or more felonies and which serves to commence a criminal action . . . .").  Accordingly, to the extent that Plaintiffs argue that the Felony Complaints and District Court Informations contained defamatory statements, the NCPD officers who made those statements are protected from liability by an absolute immunity.  *See Goncalves v. Reynolds*, 198 F. Supp. 2d 278, 282 (W.D.N.Y. 2001) (holding that absolute immunity shielded the defendant from liability for defamation where the "defendant's actions with respect to plaintiff's arrest and the bringing of the assault charge were clearly prosecutorial in nature, and were directly related to the decision to prosecute plaintiff").  Because the non-defendant police officers who completed the Felony Complaints and District Court Informations are protected by absolute immunity, Plaintiffs' defamation claim against Nassau County fails as a matter of law.

Based on the foregoing, Defendants' motion for summary judgment is granted with respect to Plaintiffs' defamation claim.

5. Trespass

To prevail on a claim for trespass under New York law, a plaintiff must establish "an intrusion upon the property of another without permission." *Christian v. Town of Riga*, 649 F. Supp. 2d 84, 93 (W.D.N.Y. 2009); *see also Hill v. Raziano*, 63 A.D.3d 682, 683, 880 N.Y.S.2d 173 (2d Dep't 2009) ("Entering upon the property of

another without permission, even if innocently or by mistake, constitutes trespass.").

Similarly, a plaintiff may establish a trespass by demonstrating "a refusal to leave after permission has been granted but thereafter withdrawn." *Volunteer Fire Ass'n of Tappan, Inc. v. County of Rockland*, 101 A.D.3d 853, 855, 956 N.Y.S.2d 102 (2d Dep't 2012). However, "law-enforcement officials have a privilege to enter private property to perform their legal duties." *Reynolds v. United States*, 927 F. Supp. 91, 96 (W.D.N.Y. 1996); *see also Nicholas*, 2010 WL 3261409, at *22 ("If a law officer enters onto Plaintiff's property to carry out his official duties, his entry is justified and a trespass claim will not succeed."); *Pari v. City of Binghamton*, 57 A.D.2d 674, 675, 393 N.Y.S.2d 815 (3d Dep't 1997) ("[I]t is . . . well settled that the police have a general obligation to assist those whom they reasonably believe to be in distress and that exigent circumstances can result in a situation wherein a warrantless intrusion is justified."); 75 Am. Jur. 2d Trespass § 103 ("A law enforcement officer is privileged to commit a trespass if he is exercising his lawful authority."). Here, it is undisputed that the NCPD officers' initial presence on the Frederiques' property was privileged, as they were responding to Johnson's 911 emergency call. Therefore, the relevant inquiry is whether their entry into, and subsequent search of, the Frederique Home constitutes a trespass.

A plaintiff is unable to establish a claim for trespass under New York state law where he or she consents to the defendant's presence on the property. *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, No. M21-88, 2014 WL 840955, at *3 n.52 (S.D.N.Y. Mar. 3, 2014) (observing that consent is a defense to a trespass claim);

*see also Machleder v. Diaz*, 538 F. Supp. 1364, 1375 (S.D.N.Y. 1982) ("[I]mplied consent to be on plaintiffs' property precludes liability for trespass."). However, for consent to be valid, "it must be voluntarily and freely given and not the product of duress or coercion." *United States v. Gaviria*, 740 F.2d 174, 182 (2d Cir. 1984); *see also United States v. Sanchez*, 499 F. Supp. 622, 624 (E.D.N.Y. 1980) ("[A] consent to search, even though not the product of coercion or deceit, is invalid where it is 'unfairly' obtained, as, for instance, where it is merely an acquiescence in a mistaken claim of lawful authority to search irrespective of consent."); *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) ("So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search."). Similarly, "[a] consenting individual 'may . . . delimit as he chooses the scope of the search to which he consents.'" *McNeice v. Town of Waterford*, 607 F. App'x 103, 104 (2d Cir. 2015) (quoting *Florida v. Jimeno*, 500 U.S. 248, 252, 111 S. Ct. 1801, 1804 (1991)). Ultimately, "[w]hether consent was voluntarily given is 'a question of fact to be determined from all the circumstances.'" *United States v. Schaefer*, 859 F. Supp. 2d 397, 406 (E.D.N.Y. 2012) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49, 93 S. Ct. 2041, 2059 (1973)).

i.  *Officers Scholl and Rosario*

Plaintiffs fail to identify a question of material fact with respect to their state law trespass claim against Officers Scholl and Rosario. As discussed above, Scholl did not enter the Frederique Home, and Rosario only entered the home to arrest Luckelson. Defs.' 56.1 Stmt. ¶¶ 98, 128. Because Plaintiffs' do not oppose

Defendants' argument that exigent circumstances existed, it is undisputed that Rosario was performing his legal duties, and his presence in the Frederique Home was therefore privileged. *See Nicholas*, 2012 WL 3261409, at *22 (holding that an officer's presence on the plaintiff's property was privileged where the plaintiff made a complaint to the police department). Therefore, Plaintiffs' state law claim for trespass against Officers Scholl and Rosario fails as a matter of law.

  *ii. Nassau County*

  There are questions of material fact, however, as to whether Paul voluntarily consented to the search of the Frederique Home sufficient to defeat Defendants' motion for summary judgment on behalf of Nassau County. Plaintiffs allege that NCPD officers "intentionally remained in [their] home and on Plaintiff's [*sic*] property surrounding the residential home despite being asked to leave by Plaintiffs." Am. Compl. ¶ 110. Although Plaintiffs argue that the Consent to Search Form that Paul signed is invalid because it was executed under duress and after officers searched the Frederique Home, prior to that, Paul impliedly consented to a search of the home by giving NCPD officers keys to the upstairs. *See* Pls.' 56.1 Stmt. ¶¶ 385-88; *see also United States v. Rivera*, 321 F.2d 704, 709 (2d Cir. 1963) (holding that consent was freely given where the defendant opened the door of the apartment for the agents with his own keys); *People v. DePace*, 127 A.D.2d 847, 848, 511 N.Y.S.2d 950 (2d Dep't 1987) (holding that consent was voluntary where the individual "not only volunteered his consent but also gave [the officer] his car keys to facilitate the search"); *People v. Abrams*, 95 A.D.2d 155, 158, 465 N.Y.S.2d 208 (2d Dep't 1983) ("Since consent may

be established by word or deed, a defendant who voluntarily gives his keys to police officer to permit his vehicle to be searched validly consents to search."). However, according to Plaintiffs, NCPD officers began "kicking at the door to force their way into the upper part of the house." Pls.' Opp'n at 16. Plaintiffs further argue that, "[t]he police intimidated Paul Frederique into giving them the key to the upper portion of the home," and that "Paul gave the police the key in order to prevent them from breaking down the door." Pls.' 56.1 Stmt. ¶¶ 385-86. Accepting Plaintiffs' allegations as true, a reasonable jury could find that Paul's consent was obtained through intimidation or other improper means. *See Incitti v. Skinner*, No. 99-CV-601, 1994 WL 532527, at *6 (N.D.N.Y. Sept. 14, 1994) (denying motion for summary judgment where the "Plaintiff's version of events indicate[d] that his consent was obtained through a combination of intimidation and improper threats"). Therefore, Plaintiffs have identified questions of material fact with respect to their trespass claim against Nassau County.

Based on the foregoing, Defendants' motion for summary judgment is granted with respect to Plaintiffs' state law trespass claim against Officers Rosario and Scholl and denied with respect to Plaintiffs' state law trespass claim against Nassau County.

## E. Overlapping Claims for False Arrest, Malicious Prosecution, and Abuse of Process

Having determined that Officers Scholl and Rosario are entitled to summary judgment with respect to Plaintiffs' claims arising under Section 1983 for false arrest, malicious prosecution, and abuse of process, summary judgment is also appropriate to the extent that those claims arise under New York state law. *See Golden v. City of*

*New York*, 418 F. Supp. 2d 226, 235 (E.D.N.Y. 2006) ("Since claims for false arrest and false imprisonment, malicious prosecution, and abuse of process are no different whether brought under Section 1983 or under state law, summary judgment is also appropriate in favor of defendants on plaintiff's state law claims for false arrest and false imprisonment, malicious prosecution, and abuse of process."); *see also Smith v. City of New York*, No. 04 Civ. 3286, 2010 WL 3397683, at *14 (S.D.N.Y. Aug. 27, 2010) ("Because plaintiff's federal claims for false arrest [and] malicious prosecution . . . are dismissed on summary judgment . . . to the extent plaintiff brings analogous state law claims, those claims are dismissed as well because the elements are the same."). Therefore, Defendants' motion for summary judgment is granted with respect to Plaintiffs' state law claims for false arrest, malicious prosecution, and abuse of process against Officers Scholl and Rosario.

However, the facts and circumstances relevant in determining that Officers Scholl and Rosario are not liable for false arrest, malicious prosecution, and abuse of process are not necessarily applicable to the non-defendant police officers. Therefore, because a municipality may be vicariously liable for its employees' state law torts of false arrest, malicious prosecution, and abuse of process, the Court considers whether questions of material fact exist regarding the actions of the non-defendant police officers. *See Sankar v. City of New York*, 867 F. Supp. 2d 297, 313 (E.D.N.Y. 2012).

1. <u>False Arrest</u>

Plaintiffs fail to identify a question of material fact with respect to their state law false arrest claim against Nassau County. As discussed above, the existence of

probable cause for an arrest is a complete defense to a false arrest claim. *See Jenkins*, 478 F.3d at 88. Having conceded that probable cause existed to arrest Stanley and Luckelson on April 8, 2010, Plaintiffs are unable to establish that the non-defendant police officers are liable for false arrest. Therefore, their false arrest claim against Nassau County fails as a matter of law. *See Shapiro v. Kronfeld*, No. 00 Civ. 6286, 2004 WL 2698889, at *24 (S.D.N.Y. Nov. 24, 2004) ("[T]here can be no imposition of vicarious liability in the absence of underlying liability.").

2. Malicious Prosecution

Although Plaintiffs fail to identify a question of material fact with respect to Stanley's malicious prosecution claim against Nassau County, questions of material fact exist regarding Luckelson's claim. It is undisputed that non-defendant police officers initiated criminal proceedings by completing corroborating affidavits and signing Felony Complaints and District Court Informations charging Stanley and Luckelson with crimes. *See* Reissman Decl. Exs. V, W, AG-AJ; *see also Llerando-Phipps*, 390 F. Supp. 2d at 382-83 (holding that police officers initiated criminal proceedings by signing felony complaints). Therefore, the relevant inquiry is whether probable cause to commence criminal proceedings existed for each of the crimes with which Stanley and Luckelson were charged. *See Rodriguez*, 2011 U.S. Dist. LEXIS 122871, at *13.[8]

---

[8] Although probable cause must exist at the time a criminal proceeding is initiated—and not only at the time of arrest—to be a complete defense to a malicious prosecution claim, "in the absence of exculpatory facts which became known after an arrest, probable cause to arrest is a complete defense to a claim of malicious prosecution." *D'Angelo v. Kirschner*, 288 F. App'x 724, 726 (2d Cir. 2008). Here, there is no evidence that exculpatory facts became known between the moment when Stanley and Luckelson were arrested and when each was formally criminally charged. Therefore, it is appropriate to consider whether probable cause existed at the time of arrest.

Probable cause exists where an arresting officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). Whether probable cause exists depends "solely on those facts available to the officer leading up to, and at the time of, the arrest." *Simons v. New York*, 472 F. Supp. 2d 253, 261 (N.D.N.Y. 2007). Moreover, malice may generally be inferred from a lack of probable cause to commence a criminal proceeding. *See Khan v. Ryan*, 145 F. Supp. 2d 280, 285 (E.D.N.Y. 2001) ("In most cases, . . . malice may be inferred from the lack of probable cause.").

       i.     *Stanley Frederique*

Although Stanley was charged with menacing in the second degree in violation of N.Y. Penal Law § 120.14 and endangering the welfare of a child in violation of N.Y. Penal Law § 260.10, Plaintiffs only argue that Defendants lacked probable cause with respect to the menacing charge. *See* Pls.' Opp'n at 20-21. Relevant for purposes of this action, "[a] person is guilty of menacing in the second degree when . . . [h]e or she intentionally places or attempts to place another person in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon, dangerous instrument, or what appears to be a pistol, revolver, rifle, shotgun, machine gun, or other firearm." N.Y. Penal Law § 120.14(1). It is well-established that "an innocuous instrument can become a dangerous instrument when 'under the circumstances in which it is . . . threatened to be used, [it] is reasonably capable of causing death or

other serious physical injury.'" *People v. Garraway*, 187 A.D.2d 761, 762, 589 N.Y.S.2d 942 (3d Dep't 1992) (quoting N.Y. Penal Law § 10.00(13)). Indeed, courts have specifically held that a dog can be considered a "dangerous instrument" for purposes of menacing in the second degree. *See Garraway*, 187 A.D.2d at 762 (holding that a pit bull dog was a dangerous instrument); *People v. Torrez*, 86 Misc.2d 369, 371, 382 N.Y.S.2d 233 (Sup. Ct. Bronx Cty. 1976) (holding that a German Shepard dog was a dangerous instrument). Therefore, the relevant inquiry with respect to Stanley is whether he intentionally placed or attempted to place another person in reasonable fear of physical injury.

Applying these standards, the Court concludes that there is no question of material fact as to whether probable cause existed to prosecute Stanley for menacing in the second degree sufficient to defeat summary judgment. In her April 9, 2010 statement given to Detectives Rogan and Lee, Johnson stated that "Stanley told the guy in the tan shirt [Ferrucci], 'move away from the fucking door before I let the dog go.'" *See* Reissman Decl. Ex. C. Ferrucci corroborated this information in his affidavit, writing that "one of the males stated '[d]on't come near the fence I'll let the dog out on you.'" *Id.* at Ex. D ¶ 6. It is undisputed that Ferrucci relayed this information to the NCPD officers who subsequently arrived at the scene and initiated criminal proceedings against Stanley. *See* Defs.' 56.1 Stmt. ¶¶ 134, 151. Consistent with these accounts, an Arrest Narrative in the April 9, 2010 NCPD Crime Report reads, "One of the defendants that [Johnson] identified as Stanley Frederique threatened that if AMT Ferrucci didn't back away from the gate the defendant would

release his pitbull." *See* Reissman Decl. Ex. S. These facts are sufficient to establish probable cause to commence legal proceedings against Stanley for menacing in the second degree. *See DiStefano v. Sedita*, No. 11-CV-1125, 2014 WL 349251, at *8 (E.D.N.Y. Jan. 31, 2014) (holding that probable cause existed to arrest for menacing in the second degree where a victim's complaints to 911 were corroborated by physical evidence).

In opposition, Plaintiffs argue that Johnson's recantation "provides proof, or raises issues of fact, that the Defendants were aware . . . that they lacked probable cause to arrest Stanley for [menacing]." *See* Pls.' Opp'n at 20-21. According to Plaintiffs, once Johnson "was able to review the initial statement written for her by the police, she immediately noticed that the statement contained falsities and attempted to recant the police's false statement." Pls.' 56.1 Stmt. ¶ 345. However, Johnson swore that she reviewed both the Supporting Deposition and the statement she gave to Detectives Rogan and Lee when they were made, signed both statements, and swore to their truth under the penalty of prosecution. *See* Reissman Decl. Exs. B, C. Accordingly, the officers who completed supporting depositions and assisted in creating the Felony Complaints and District Court Informations reasonably relied on Johnson's statements in commencing legal proceedings against Stanley and Luckelson. *See Curanaj v. Cordone*, No. 10 Civ. 5689, 2012 WL 4221042, at *10 (S.D.N.Y. Sept. 19, 2012) (holding that probable cause existed to initiate criminal proceedings for menacing in the second degree where a witness told police officers that the plaintiff threatened him with physical violence). Moreover, although

Johnson wrote that "the statements are false and were not written by [her]," she does not specifically identify what statements are false, and she actually makes no reference at all to Stanley, his menacing charge, or her prior statement accusing him of threatening to release the dog. *See* Reissman Decl. Ex. AS. Accordingly, based on the information the officers possessed at the time criminal prosecution was commenced against Stanley, probable cause existed with respect to his menacing in the second degree charge. Therefore Plaintiffs' New York state law malicious prosecution claim fails as a matter of law insofar as it is asserted on behalf of Stanley.

      *ii.    Luckelson Frederique*

Luckelson was charged with: (i) one count of assault in the second degree in violation of N.Y. Penal Law § 120.05(2) for injuring Johnson by breaking a vase over her head; (ii) one count of attempted assault in the second degree in violation of N.Y. Penal Law § 120.05(3) for purposely releasing the pit bull on the officers; (iii) one count of assault in the second degree in violation of N.Y. Penal Law § 120.05(3) for injuring Officer Harracksingh while being arrested; and (iv) one count of resisting arrest in violation of N.Y. Penal Law § 205.30 for flailing his arms and refusing to allow NCPD officers to handcuff him. *See* Reissman Decl. Exs. AG-AJ. As an initial matter, Plaintiffs concede that probable cause existed to prosecute Luckelson for the alleged assault of Johnson in violation of N.Y. Penal Law § 120.05(2). *See* Pls.' Opp'n at 20.

Pursuant to N.Y. Penal Law § 120.05(3), "[a] person is guilty of assault in the second degree when . . . [w]ith intent to prevent a . . . police officer . . . from performing

a lawful duty by means including releasing or failing to control an animal under circumstances evincing the actor's intent that the animal obstruct the lawful activity of such . . . police officer . . . he or she causes physical injury to such . . . police officer . . . ." N.Y. Penal Law § 120.05(3). Here, insofar as Luckelson's assault charge is premised on injuring Officer Harracksingh, Plaintiffs argue that Luckelson did not forcibly kick Harracksingh, and that Harracksingh's testimony established that he was unaware how he sustained the injury to his knee. *See* Pls.' Opp'n at 22. Indeed, when asked at his deposition whether he had "reason to believe [Luckelson] committed any assault on [him] while [they] were in the basement," Harracksingh responded, "[a]t that time, no." *See* Calliste Decl. Ex. J at 90:11-18. Defendants identify no evidence uncovered thereafter that would support an inference that Luckelson assaulted Harracksingh in the basement during the course of being arrested. Nevertheless, that night, Harracksingh signed a Felony Complaint charging Luckelson with assault in the second degree in violation of N.Y. Penal Law § 120.05(3). *See* Reissman Decl. Ex. AI. Harracksingh's own testimony establishes that questions of material fact exist regarding whether he had probable cause to commence criminal proceedings against Luckelson for assault in the second degree based on his alleged knee injury.

Next, although Luckelson was also charged with attempted assault in the second degree in violation of N.Y. Penal Law § 120.05(3), "[a] defendant cannot be convicted of attempted assault in the second degree under Penal Law § 120.05(3) because it is a legal impossibility." *People v. Wyrich*, 259 A.D.2d 718, 718, 686

63

N.Y.S.2d 853 (2d Dep't 1999) (internal quotation omitted). Although a defendant may "plead guilty to a nonexistent crime in satisfaction of an indictment charging a crime for which a greater penalty may be imposed," *see People v. Daniels*, 237 A.D.2d 298, 298, 654 N.Y.S.2d 799 (2d Dep't 1997), here, Luckelson did not plead guilty to the nonexistent crime of attempted assault in the second degree, but rather, was initially charged with that crime. It stands to reason that a Felony Complaint solely charging a nonexistent crime can serve as a basis for a malicious prosecution claim. Therefore, questions of material fact also exist with respect to Luckelson's malicious prosecution claim as it relates to his charge for attempted assault in the second degree.

Finally, pursuant to N.Y. Penal Law § 205.30, "[a] person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer . . . from effecting an authorized arrest of himself or another person." N.Y. Penal Law § 205.30; *see also Curry v. City of Syracuse*, 316 F.3d 324, 336 (2d Cir. 2003) ("There are . . . at least two essential elements of a charge for resisting arrest under New York law: (1) the person charged must have intentionally attempted to prevent the arrest of himself or someone else, and (2) the arrest he attempted to prevent must itself have been supported by a warrant or by probable cause."). It is well-established that "probable cause to arrest is a prerequisite for making an authorized arrest, and if there is no probable cause to arrest a person, that person cannot be guilty of resisting arrest." *Curry*, 316 F.3d at 336. As discussed herein, it is undisputed that probable cause existed to arrest Luckelson. *See* Pls.' Opp'n at 20. However, although Defendants argue that Luckelson flailed his arms and legs in an attempt to prevent

his arrest, Luckelson testified that he complied with the officers' commands, and was unable to flail his arms because his shoulder was dislocated. *See* Pls.' 56.1 Stmt. ¶¶ 363-66. Accepting Luckelson's testimony as true, questions of material fact exist as to whether non-defendant police officers had probable cause to commence criminal proceedings against Luckelson for resisting arrest.

Accordingly, because there are questions of material fact as to whether probable cause existed to prosecute Luckelson for assault and attempted assault in the second degree and resisting arrest, summary judgment on those claims as to Nassau County is inappropriate, and therefore denied.

### 3. Abuse of Process

Insofar as Plaintiffs' state law abuse of process claim is considered distinct from their malicious prosecution claim, Plaintiffs fail to identify a question of material fact sufficient to defeat Defendants' motion for summary judgment. As discussed above with respect to Officers Scholl and Rosario, there is no evidence that non-defendant police officers employed any other form of regularly issued legal process to compel the performance or forbearance of some act, as required to establish a claim for abuse of process. *See Bertuglia*, 2015 WL 5692159, at *21. Therefore, Plaintiffs are unable to establish that non-defendant police officers are liable for abuse of process, and their cause of action against Nassau County fails as a matter of law.

Based on the foregoing, Defendants' motion for summary judgment is granted with respect to Plaintiffs' state law claims of false arrest and abuse of process.

Defendants' motion is also granted with respect to their state law claim for malicious prosecution insofar as it is asserted on behalf of Stanley, and denied insofar as it is asserted on behalf of Luckelson.

## IV.  CONCLUSION

For the reasons set forth herein, Defendants' motion for summary judgment is:

1. **DENIED** with respect to Plaintiffs' claims against Officers Hector Rosario and Jason Scholl arising under Section 1983 for excessive force;

2. **GRANTED** with respect to Plaintiffs' claims against Officers Hector Rosario and Jason Scholl arising under Section 1983 for unlawful search, unlawful seizure, false arrest, malicious prosecution, and abuse of process;

3. **GRANTED** with respect to Plaintiffs' claim against Nassau County for municipal liability arising under Section 1983;

4. **GRANTED** with respect to Plaintiffs' claims against Officers Hector Rosario and Jason Scholl arising under New York common law; and

5. **DENIED** with respect to Plaintiffs' claims against Nassau County arising under New York common law for trespass and malicious prosecution insofar as it is asserted on behalf of Luckelson Frederique.

Dated:  Central Islip, New York   **SO ORDERED**
        March 11, 2016

                                   s/ Steven I. Locke
                                   STEVEN I. LOCKE
                                   United States Magistrate Judge